UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

OAKES FARMS FOOD & DISTRIBUTION
SERVICES, LLC, and FRANCIS A.
OAKES, III,

       Plaintiffs,

v.                                                    Case No. 2:20-cv-488-JLB-MRM

THE SCHOOL DISTRICT OF LEE
COUNTY, FLORIDA, GREGORY ADKINS,
FREDERICK B. ROSS, MARY FISCHER,
DEBBIE JORDAN, MELISSA W.
GIOVANELLI, CHRIS N. PATRICIA,
GWYNETTA S. GITTENS, BETSY
VAUGHN, CATHLEEN O'DANIEL
MORGAN, and JOHN DOE #1,

       Defendants.

_____/

## **ORDER**

Francis A. "Alfie" Oakes is the owner of Oakes Farms Food & Distribution Services, LLC ("Oakes Farms"). From 2016 to 2020, Oakes Farms supplied the School District of Lee County ("School District") with fresh produce. Shortly after Oakes Farms's contract with the School District was unanimously renewed for the 2020-21 school year, Mr. Oakes wrote a post on his personal Facebook page discussing the killing of George Floyd, bemoaning the "brainwashing" influence of the media, and characterizing the COVID-19 pandemic as a "hoax." Three days after Mr. Oakes's post, the School District terminated its contract with Oakes Farms. Plaintiffs believe the termination was unlawful retaliation for Mr. Oakes exercising his First Amendment rights, a breach of the underlying contract, and a

violation of Florida's Sunshine Law.  Accordingly, they now sue: (1) the School District; (2) the members of the Lee County School Board (Mary Fischer, Debbie Jordan, Melissa Giovanelli, Chris N. Patricia, Gwynetta S. Gittens, Betsy Vaughn, and Cathleen O'Daniel Morgan, referred to collectively as the "School Board" or "Board Members"); (3)  Gregory Adkins, the School District's Superintendent; and (4) Frederick B. Ross, the School District's Director of Procurement.  (Doc. 53.)

Defendants move to dismiss Plaintiffs' Second Amended Complaint for lack of standing and failure to state a claim.  (Doc. 57.)  After careful review of the parties' arguments and accepting all facts alleged in the Second Amended Complaint as true, the Court agrees with Defendants in only one respect: the Second Amended Complaint fails to state a breach-of-contract claim for the termination of the contract set forth in Count III.  But the Court finds that Plaintiffs have sufficiently alleged a breach of contract for the School Board's failure to provide Oakes Farms with seven days' notice prior to its termination of the contract.  The motion to dismiss is denied in all other respects, and the case shall proceed with discovery in the normal course.

### BACKGROUND[1]

## I.   The School District terminates Oakes Farms's contract after Mr. Oakes's Facebook post.

Oakes Farms continuously provided the School District with fresh produce over a four-year period, from 2016 to 2020.  (Doc. 53 at ¶ 24.)  In June 2018, the

---

[1] Several declarations were previously submitted in support of Plaintiffs' motion for preliminary injunction (Doc. 55), which was withdrawn (Doc. 79).  For

School Board voted to approve Oakes Farms's bid on a contract to supply the School District with produce for a period of three years, renewable for up to three additional one-year periods. (Id. at ¶ 23.) Oakes Farms's performance under the contract was apparently satisfactory through June 2020 because the School Board unanimously voted to renew the contract for the 2020-21 school year. (Id. at ¶ 26.)

On June 8, 2020, Mr. Oakes posted the following on his personal Facebook:

> The COVID19 hoax did not work to bring down our great President and now this…the black lives matter race hoax…REALLY …what else do the disgraceful powers that control this world with their puppets in the media have planned for us in next 5 months? Is it possible that so many of our fellow American citizens could really be this ignorant?
>
> When I was a young child I vividly remember during church services a sermon that described how there would come a time where many people would not recognize good from evil or truth from blatant lies…I remember thinking to myself how could this ever happens? It seems impossible from the paradigm that I existed in.
>
> Well here we are…in the past 3 months I have watched not only OUR country's economy but the entire world economy brought to ruins for no other reason that multitudes of men and women have allowed themselves to be controlled by deceit and fear. The corrupt world powers and their brainwashing arms of the media have proven the ability to program the masses.
>
> Now only weeks after the COVID programming many of the same lemmings have allowed the media to convince them that the amazing men and women that put their lives on the line every day to protect us are bad but some disgraceful drug addict felon is a hero being paraded around the country. Can this really be happening??

---

purposes of this motion, the Court will rely solely on the well-pleaded allegations in the Second Amended Complaint without considering any of the declarations.

There is absolutely no dispute that George Floyd was a disgraceful career criminal, thief, drug addict, drug dealer and ex-con who served 5 yrs in prison for armed robbery on a pregnant woman, and spent his last days passing around fake 20's to store owners in Minnesota. Our new media hero "Gentle George" had two types of heart disease due to the tremendous amount of illegal drugs he was taking daily. In his autopsy he tested positive for marijuana, Fentanyl, Amphetamine, morphine, methamphetamine, and sever others .. When officer Chauvin responded to a 911 call that someone was passing counterfeit 20s the store owner pointed out Floyd, who was sitting in a car across the street.  When officer Chauvin confronted Floyd, and asked him to get out of the car, Floyd refused and was not cooperating with the officer, a 20 year public servant, who was unlucky enough to be the one having to deal with this drug addicted criminal, a true disgrace to our human race that represents all that is wrong with our society.  Floyd continued to resist the officers orders during this incident as one would expect from a mindless drug addict.  Now the media, Hollywood and many of our disgraceful politicians want you to be outraged that this career criminal drug abusing thug suffered the consequences of a lifetime of bad choices.  Unfortunately the liberal mindset that has been instilled in so many of our young generation has taught them to take no personal responsibility for their actions. They have been taught that if they do not success than [sic] they must be a victim.  These lost souls without any direction or sense of purpose are so easily manipulated to blame others for their lack of self worth.  It is these lost souls with little to no self worth who are the "protesters" that we see looting our stores, burning down our cities, defaming our national monuments and disgracing the great men and women that built this country.. but I suppose now they finally found a purpose.

As we will likely be facing tough times ahead, I can only pray that these lost souls find a true purpose beyond the blame and deceit that is testing if not ruining the strong fabric of once our great nation.

(Id. at ¶ 28 (typographical errors in original).)[2]  Almost immediately, someone created an online petition on Change.org, calling on the School District to "cut ties with Oakes Farms as founder and CEO Alfie Oakes has shared racist views about the murder of George Floyd on his Facebook page."  (Id. at ¶ 29.)

One day after Mr. Oakes's post, local news outlets reported that the School District was facing a "backlash" for the Facebook post, and that the School District was "aware of the petition that stemmed from [the] post."  (Id. at ¶ 31.)  On June 11, three days after the post, Oakes Farms was contacted by Defendant Frederick B. Ross, the School District's Director of Procurement.  Director Ross informed Oakes Farms that the School District decided to terminate its contract with Oakes Farms "for convenience" without further explanation.  (Id. at ¶ 32.)  The next day, on June 12, Oakes Farms received a written notice of termination signed by Director Ross.  (Id. at ¶ 35.)  The notice provides that it "has been determined that it is in the best interest of the [School] District to terminate the contract for convenience.  The last delivery date of ordered products will be June 25, 2020."[3]  (Doc. 53-4.)

## II.   The Board Members make public comments about Mr. Oakes's post.

As alleged in the Second Amended Complaint, between June 9 and June 11 certain members of the School Board made public statements that suggested the

---

[2] The Court relies on the transcription of the post in the Second Amended Complaint.  Defendants have not disputed the transcription, and neither side has provided the Court with a screenshot of the post.

[3] The School District continued purchasing from Oakes Farms through June 25, apparently because it wanted to use up all of its allocations from the U.S. Department of Defense ("DOD").  (Doc. 53 at ¶ 34.)

impetus for terminating Oakes Farms's contract was Mr. Oakes's personal views (as expressed in the Facebook post) about the Black Lives Matter protests and the circumstances surrounding George Floyd's death.

On June 9, Defendant Gwynetta Gittens gave a televised interview in which she stated, "The things that were said in that post, they were horrible.  Being black myself, it's hard to read where someone vilifies someone for their own, you know, purposes . . . . I do not want to, in any way, shape or form, give a dime to that company."  (Doc. 53 at ¶ 49.)

Two more members of the School Board—Defendants Cathleen Morgan and Debbie Jordan—were cited as supporting the decision to terminate Oakes Farms's contract in a local news article.  Ms. Jordan was quoted as saying that Mr. Oakes's Facebook post was "very upsetting" and went on to explain, "When we say that we're going to be committed to our values of diversity and inclusion and condemn racism in all forms, we have to stand by that.  We cannot have one statement that says one thing and allow another to stand."  (Id. at ¶ 50.)

## III.   The School District's process for deciding whether to terminate Oakes's Farms contract is unclear.

The School District's contract with Oakes Farms contains two relevant clauses regarding termination in paragraph 29.  The first clause provides:

> In the event any of the provisions of the contract awarded as a result of this ITN are violated by the Vendor, the Superintendent or designee will give written notice to the Vendor stating the deficiencies and unless the deficiencies are corrected within ten (10) calendar days, recommendation may be made to the Board for immediate cancellation.

6

(Doc. 53-1 at 7.)  Paragraph 29 also contains a "convenience" clause, which permits the Board to terminate the contract "at any time and for any reason":

> The [School] Board reserves the right to terminate any contract resulting from this invitation at any time and for any reason, upon giving seven (7) days prior written notice to the other party.  If said contract should be terminated for convenience as provided herein, the Board will be relieved of all obligations under said contract.

(Id.)  Plaintiffs are unsure of how exactly the School Board decided to terminate the contract; they rely primarily on a local news article which reported that Superintendent Adkins "called each school board member prior to" the announcement of the contract's termination.  (Doc. 53 at ¶ 50.)  Based on this report, Plaintiffs hypothesize that either: (1) Superintendent Adkins acted as a liaison between each individual Board Member and informally polled them on whether they agreed with his recommendation to terminate the contract, or (2) the School Board delegated its decision-making authority to the Superintendent.  (Id. at ¶¶ 4, 114, 119.)  For purposes of their motion to dismiss, Defendants "concede" that the delegation hypothesis is correct.  (Doc. 57 at 9.)

Plaintiffs allege that Defendants' retaliation has caused them damages in excess of $50 million.  Mr. Oakes also claims that his constitutionally protected right to free speech has been chilled by Defendants' retaliation.

**DISCUSSION**[4]

## I.   Shareholder standing rule.

The Court begins its discussion with the tail-end of Defendants' motion,

where they argue that the Second Amended Complaint fails to distinguish between

the interests of Mr. Oakes and the interests of Oakes Farms.  (Doc. 57 at 22.)  This

failure, Defendants argue, invites the reader to "accept the conclusory conflation

that all [Plaintiffs] have somehow been harmed by all [Defendants]."  (Id.)  In

support, Defendants cite the so-called shareholder standing rule: corporate

shareholders do not have individual standing to sue for injuries suffered by their

corporations.  (Id.); see also Gregory v. Mitchell, 634 F.2d 199, 202 (5th Cir. 1981).[5]

The Court interprets this argument as a challenge to standing.

The Supreme Court recognizes two types of standing: (1) constitutional

standing, which derives from the Case or Controversy Clause in Article III of the

Constitution; and (2) prudential standing, "which comprises three non-

---

[4] A district court may dismiss a complaint under Federal Rule of Civil Procedure 12((b)(6) for either failure to state a claim or for lack of prudential standing.  See Newton v. Duke Energy Fla., LLC, 895 F.3d 1270, 1274 n.6 (11th Cir. 2018).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1274 n.1 (11th Cir. 1999) (citing Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir.1998)).

[5] The Court assumes that the shareholder standing rule has equal relevance to LLCs.  See United States v. All Funds in the Account of Prop. Futures, Inc., 820 F. Supp. 2d 1305, 1328 (S.D. Fla. 2011), aff'd sub nom. United States v. ADT Sec. Servs., Inc., 522 F. App'x 480 (11th Cir. 2013).

8

constitutional, non-jurisdictional, policy-based limitations on the availability of judicial review." Mulhall v. UNITE HERE Loc. 355, 618 F.3d 1279, 1290 (11th Cir. 2010) (citing Am. Iron and Steel Inst. v. OSHA, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999)). One such prudential limitation is "that the plaintiff . . . cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975). The shareholder standing rule is either a cousin or direct descendant of this prudential limitation. See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd., 493 U.S. 331, 336 (1990); Deal v. Tugalo Gas Co., 991 F.3d 1313, 1322–23 (11th Cir. 2021).

Although the shareholder standing rule generally bars shareholders from enforcing a corporation's rights, there is "an exception to this rule allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." Franchise Tax Bd. of Cal., 493 U.S. at 336; see also Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1156 (10th Cir. 2013) (en banc) (Gorsuch, J., concurring) (explaining that a challenge to a contraceptive mandate that infringes upon the religious beliefs of corporate owners who would have to direct compliance with that mandate does not run afoul of the shareholder standing rule because the owners have a direct and personal interest at stake), aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014).

As far as the Court can discern, Defendants argue that Mr. Oakes has no individual standing to sue for an injury suffered by Oakes Farms. Viewing the facts in the light most favorable to Plaintiffs at this early stage of litigation, the Court

finds that Mr. Oakes has standing because he has sufficiently alleged that he suffered a distinct and personal injury.  The protected speech at issue in this case was a Facebook post that Mr. Oakes made on his "personal Facebook page in his own name."  (Doc. 53 at ¶ 27.)

Accepting Plaintiffs' allegations as true, as the Court must at this time, the School District—acting through the Board Members, Superintendent Adkins, and Director Ross—terminated Oakes Farms's contract because of Mr. Oakes's protected speech.  This termination caused two distinct types of injury: (1) the economic harm suffered by Oakes Farms; and (2) the deterrent effect on Mr. Oakes, as a "person of ordinary firmness," from exercising his First Amendment rights.[6]  (Id. at ¶ 81); see also Bennett v. Hendrix, 423 F.3d 1247, 1254 (11th Cir. 2005) (explaining that retaliatory conduct by the government against non-employees is judged by whether a person of "ordinary firmness" would be deterred from exercising their First Amendment rights, and this type of injury gives rise to Article III standing).

Defendants' argument is vaguely written, and they never flat-out say that the intangible harm to Mr. Oakes's right of free speech is insufficient to overcome the shareholder standing rule.  But if that is their argument, the Court disagrees.  The harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms, and the shareholder standing rule is therefore

---

[6] If Mr. Oakes's injury were limited to Oakes Farms's economic interests, the shareholder standing rule may have entirely precluded his individual claim.  His distinct First Amendment interests, however, mean that he may at least be entitled to nominal damages.  See Uzuegbunam v. Preczewski, 141 S. Ct. 792, 801–02 (2021) (holding that nominal damages satisfy Article III's redressability requirement).

inapplicable.  See O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 715

(1996) (reviewing a First Amendment retaliation claim brought by both a tow-truck

company and its owner without discussing any standing issues); S. Atl. Cos., LLC v.

Sch. Bd. of Orange Cnty., 699 F. App'x 842, 850 (11th Cir. 2017) (Jordan, J.,

concurring in part and dissenting in part) (collecting cases from other jurisdictions

that allow business owners to bring retaliation actions when their business entity is

retaliated against for the owners' personal speech),[7] White v. Sch. Bd. of

Hillsborough Cnty., 636 F. Supp. 2d 1272, 1279–80 & n.1 (M.D. Fla. 2007)

("Plaintiff alleges . . . that she personally engaged in protected activity under the

First Amendment, that Defendant retaliated by closing her school, and that she has

been unable to open another charter school.").[8]  Accordingly, the Court believes that

both Mr. Oakes and Oakes Farms have standing to pursue their claims.

---

[7] The majority in South Atlantic Companies held that the trial court did not abuse its discretion by awarding fees for the owners' frivolous retaliation claims because, even if the owners did exercise any speech in their individual capacity, there was no evidence that the defendant's retaliatory conduct was for the owners' personal speech.  699 F. App'x at 849.  The question of capacity was not addressed.

[8] Cases from other circuits seem to support a contrary position, but none of these cases were discussed in Defendants' papers.  In any event, the Court believes they are distinguishable because the individual plaintiffs in those cases apparently failed to allege an injury distinct from their business entities.  Compare Rasche v. Village of Beecher, 336 F.3d 588, 595 n.8 (7th Cir. 2003) ("[B]ecause Velma asserts that defendants retaliated against her First Amendment rights, she has standing to assert an injury sustained as a result and she is not bringing claims on behalf of third parties, but asserts her own claim, not that of her husband." (internal quotation marks omitted)), and Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1318–19 (9th Cir. 1989) ("The first amendment rights that were allegedly violated belong to Mr. Soranno, not the corporation.  Mr. Soranno clearly has standing to contest the deprivation of those rights."), with Pagan v. Calderon, 448 F.3d 16, 28 (1st Cir. 2006) ("[T]he complaint does not allege that any of the individual shareholders sustained a particularized, nonderivative injury that might deflect

## II.     First Amendment Retaliation Claim (Count I).

Turning to the merits, the Defendants sued in their individual capacities—the Board Members, Superintendent Adkins, and Director Ross—argue that all of the individual-capacity claims must be dismissed because: (1) none of the individual Defendants were "decisionmakers," (2) they are entitled to qualified immunity, and (3) they are entitled to absolute legislative immunity.  (Doc. 57 at 3–12.)  The Court examines (and rejects) each argument below.

### A.     "Decisionmaker" Argument

In Quinn v. Monroe County, the Eleventh Circuit distinguished between "policymakers" (who have the power to take actions that result in municipal liability under 42 U.S.C. § 1983) and "decisionmakers" (who have the power to make official decisions that result in individual liability under section 1983).  330 F.3d 1320, 1326 (11th Cir. 2003).[9]  In the employment termination context, a decisionmaker is someone who has the power to "immediately effectuate" termination, not merely to "recommend" it.  Id. at 1328; see also Kamensky v. Dean,

---

application of the usual shareholder standing rule or that any other exception pertains."); Potthoff v. Morin, 245 F.3d 710, 714 (8th Cir. 2001) ("The district court agreed with the magistrate judge that Potthoff had not pled any damages other than a derivative claim for compensatory damages based upon economic harm suffered by ComReal.").

[9] The motion to dismiss contains a confusing argument that Plaintiffs have not "plausibly alleged" any "final-policymaking claims" against the individual Defendants.  (Doc. 57 at 15–16.)  As far as the Court can tell, the individual Defendants are all being sued in their individual capacities; Plaintiffs do not claim that any single one of them was the final "policymaker."  And Defendants concede that the Second Amended Complaint states a claim against the School District (which is governed by the School Board).  (Id. at 14–15; Doc. 69 at 4).  Thus, it is unclear what the purpose of this argument is.

148 F. App'x 878, 879 (11th Cir. 2005).  Decisionmakers may be identified by examining statutes, rules, employee handbooks, or organizational charts.  <u>Quinn</u>, 330 F.3d at 1328 (citing <u>Hitt v. Connell</u>, 301 F.3d 240, 247–49 (5th Cir.2002)).

Defendants provide that the School Board, acting as a unified body, is responsible for terminating and replacing contracts.  (Doc. 57 at 4.)  But the individual Defendants (including the Board Members) allege that none of them can unilaterally terminate a contract.  (<u>Id.</u>)  And while the Superintendent may recommend policies to the School Board, Defendants claim that he too lacks authority to make decisions without the School Board's approval.  (<u>Id.</u> at 4–5.)  Against this backdrop, the individual Defendants claim that the Second Amended Complaint: (1) does not contain sufficient facts to establish that any of them "decided" to terminate Oakes Farms's contract, and, (2) there are no ultimate "facts" to support such a claim beyond their official titles.  In response, Plaintiffs candidly admit that they "are not entirely sure who among the individual Defendants made that final decision," owing to "the clandestine nature of how the School District cancelled the contract without holding a duly noticed meeting of the School Board at which they publicly discussed and voted upon a contract cancellation."  (Doc. 69 at 3.)  To fill the factual gaps, Plaintiffs rely on news reporting.

Paragraph 50 of the Second Amended Complaint cites an article from News-Press, which reported that Superintendent Adkins "called each school board member" prior to announcing that Oakes Farms's contract was terminated.  (Doc. 53 at ¶ 50.)  The article notes that Cathleen Morgan and Debbie Jordan—both

13

members of the School Board—supported the decision.  (Id.)  Ms. Jordan is quoted as saying that Mr. Oakes's Facebook post was "very upsetting" and went on to explain, "When we say that we're going to be committed to our values of diversity and inclusion and condemn racism in all forms, we have to stand by that.  We cannot have one statement that says one thing and allow another to stand."  (Id.)

Paragraph 49 quotes a televised interview with Gwynetta Gittens—another member of the School Board—in which she also seemed to support the decision to terminate Oakes Farms's contract.  Ms. Gittens stated, "The things that were said in that post, they were horrible.  Being black myself, it's hard to read where someone vilifies someone for their own, you know, purposes . . . . I do not want to, in any way, shape or form, give a dime to that company."  (Id. at ¶ 49.)

Finally, Paragraphs 32–34 of the Second Amended Complaint allege that Director Ross informed Oakes Farms that its contract would be terminated and signed the written notice of termination "for convenience."  (Id. at ¶¶ 32–34.)  The notice is attached to the Second Amended Complaint and provides: "It has been determined that it is in the best interest of the District to terminate the contract for convenience, awarded to [Oakes Farms], resulting from ITB B187336DG, effective June 11, 2020." (Doc. 53-4.)

The complaint does not discuss the remaining Board Members—Mary Fischer, Melissa W. Giovanelli, Chris N. Patricca, and Betsy Vaughn—in much detail, except to note that Ms. Fischer and Ms. Vaughn "mentioned the community response they had seen of people writing into the school board office."  (Doc. 53 at ¶

14

50.)  Ms. Fischer is also reported as stating that the termination of Oakes Farms's contract did "not require an official board vote."  (Id.)

While the process behind the termination of Oakes Farms's contract is not entirely clear, the Court is not prepared to dismiss any of the claims against the individual Defendants prior to discovery.  Viewed in the light most favorable to Plaintiffs, there are sufficient facts in the Second Amended Complaint for a trier of fact to plausibly conclude that all the individual Defendants were involved in the decision to terminate Oakes Farms's contract.  There are public statements from at least three of the seven Board Members that indicate support for the termination, and Superintendent Adkins was reported to have "called each school board member" prior to announcing the termination.  (Id. at ¶¶ 49–50, 53.)  From this, a trier of fact could infer that either the Board Members each approved the termination or simply rubberstamped the Superintendent's decision.[10]  See Griffin v. City of Jacksonville, 762 F. App'x 965, 972 (11th Cir. 2019) (explaining that a rubberstamp or "cat's paw" theory may create individual liability under section 1983 where the supervisor "took some sort of action," as opposed to merely failing to prevent the termination).

---

[10] In Kamensky, an unpublished opinion, the Eleventh Circuit refrained from adopting a "rubber stamp" exception to Quinn's "decisionmaker" inquiry.  148 F. App'x at 880.  But the Eleventh Circuit also did not reject such an exception, and other district courts in the Eleventh Circuit have allowed plaintiffs to proceed on a "rubber stamp" theory.  See, e.g., Harris v. Pierce Cnty., No. CV 513-82, 2014 WL 3974668, at *8–9 (S.D. Ga. Aug. 14, 2014); Polion v. City of Greensboro, 26 F. Supp. 3d 1197, 1219 n.16 (S.D. Ala. 2014), aff'd, 614 F. App'x 396 (11th Cir. 2015).  And the more recent unpublished decision in Griffin suggests that the Eleventh Circuit may well be amenable to the exception.  762 F. App'x at 972.

Indeed, Defendants' motion to dismiss seems to imply (without directly confirming) that some version of this story is correct. Defendants "concede," for purposes of their motion, "that Plaintiff has pleaded that the School Board delegated to [Superintendent] Adkins final authority with respect to termination of the contract." (Doc. 57 at 9.) Defendants use this concession to argue that any "delegation" of authority to Superintendent Adkins did not render him a "decisionmaker" because his actions remained constrained by the School Board. (Id. at 9–10.) But they rely on inapposite cases that deal with policymaking authority, not decision-making authority. Quinn, 330 F.3d at 1326. And even if those cases were relevant, the "rubber stamp" exception is recognized in the policymaking context. See Lopez v. Gibson, 770 F. App'x 982, 992 (11th Cir. 2019).

Director Ross's role in the termination is not entirely clear, but the Second Amended Complaint provides that he notified Oakes Farms of the termination and signed the notice of termination "of his own volition." (Id. at ¶¶ 33–35.) At this stage, given the opacity of the decision-making process, the Court believes it is plausible that Director Ross may be one of many alternate decisionmakers. After discovery clarifies who the ultimate decisionmakers were, the Court trusts that Plaintiffs will drop any individual-capacity claims that are no longer viable.

## B.    Qualified Immunity

Next, Defendants argue that they are entitled to qualified immunity in their individual capacities because Plaintiffs have failed to either cite a case materially similar to this one or show that no reasonable person could believe that qualified immunity did not apply. (Doc. 57 at 10–12.) "The doctrine of qualified immunity

16

provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Courts utilize a two-part framework to evaluate qualified immunity claims. One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 736 (2002)). "If the facts . . . show that a constitutional right has been violated, another inquiry is whether the right violated was 'clearly established.'" Id. (citation omitted).

To prove a First Amendment retaliation claim, a plaintiff must demonstrate that: (1) that they engaged in constitutionally protected speech; (2) the defendant's retaliatory conduct adversely affected that protected speech, and (3) a causal connection exists between the retaliatory conduct and the adverse effect. DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1289 (11th Cir. 2019) (citing Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005)). The question of whether speech is constitutionally protected for purposes of retaliation is governed by the balancing test in Pickering v. Board of Education, 391 U.S. 563 (1968), as modified by later Supreme Court decisions.[11] Under Pickering, courts must first "consider whether a

---

[11] Defendants' motion to dismiss goes straight to Pickering, and the Court will likewise assume that Pickering applies to both Plaintiffs. But this assumption may not hold on summary judgment. For one thing, Mr. Oakes was not a contractor

plaintiff's speech was made as a citizen and whether it implicated 'a matter of public concern.'" Moss v. City of Pembroke Pines, 782 F.3d 613, 617 (11th Cir. 2015) (quoting Carter v. City of Melbourne, 731 F.3d 1161, 1168 (11th Cir.2013)). "If this first threshold requirement is satisfied, [courts] then weigh [p]laintiff's First Amendment interests against the [defendant's] interest in regulating his speech to promote 'the efficiency of the public services it performs through its employees.'" Id.

The Court is not prepared to conclude that Plaintiffs' claims are barred by qualified immunity at this stage. For starters, Defendants' arguments appear to rely on outdated caselaw. See Martin v. Baugh, 141 F.3d 1417, 1420 (11th Cir. 1998), abrogation recognized in Akins v. Fulton Cnty., 420 F.3d 1293, 1307 (11th Cir. 2005).[12] Under the current standard, a plaintiff does not necessarily need to provide cases that are "materially similar" to survive qualified immunity if the case law gives "fair warning" to defendants. Camp v. Corr. Med. Servs., Inc., 400 F. App'x 519, 520 (11th Cir. 2010) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

_____

or employee of the School District. And it is questionable whether Oakes Farms engaged in any speech—let alone protected speech—just because its owner posted on his personal Facebook page. But see Heffernan v. City of Paterson, 136 S. Ct. 1412, 1418–19 (2016) (explaining that an employee may state a claim for First Amendment retaliation if his employer fired him based on its mistaken belief that he engaged in protected speech, even though he had not); Kinney v. Weaver, 367 F.3d 337, 359 (5th Cir. 2004) (en banc) ("[T]he determination whether the relationship between the government and an individual falls on the 'governmental employee' end of the Umbehr spectrum turns on whether the relationship is sufficiently 'analogous to an employment relationship.'" (quoting Blackburn v. City of Marshall, 42 F.3d 925, 932 (5th Cir. 1995))). The parties should be prepared to address these issues on summary judgment.

[12] Defendants cite Martin indirectly through Maggio v. Sipple, 211 F.3d 1346, 1355 (11th Cir. 2000), and Rice-Lamar v. City of Fort Lauderdale, 54 F. Supp. 2d 1137, 1147 (S.D. Fla. 1998), aff'd, 232 F.3d 836 (11th Cir. 2000).

Thus, a defendant may not be entitled to qualified immunity "even in novel factual circumstances." Id.  Alternatively, the well-pleaded facts of the complaint could demonstrate that "no reasonable person could believe that both prongs of the [qualified immunity] test had not been met." Maggio v. Sipple, 211 F.3d 1346, 1355 (11th Cir. 2000) (citation omitted).

Accepting the facts in the Second Amended Complaint as true and drawing every inference in favor of Plaintiffs, both prongs of qualified immunity appear to be satisfied such that no reasonable person could believe that they had not been met. Oakes Farms's contract was terminated because of a Facebook post made by Mr. Oakes on matters of public concern (policing practices and COVID-19) in his capacity as a private citizen (on his personal Facebook page, which nobody alleges had any reference to his role in Oakes Farms).  Defendants' side of the Pickering scale is "empty" for the moment because the Second Amended Complaint contains no allegations that the Facebook post impacted the School District's "need to maintain loyalty, discipline[,] and good working relationships," at least not if read in the light most favorable to Plaintiffs.[13]  McCullars v. Maloy, No. 6:17-cv-1587-Orl-40GJK, 2018 WL 1583639, at *4 (M.D. Fla. Apr. 2, 2018) (quoting Dartland v. Metro. Dade Cnty., 866 F.2d 1321, 1323 (11th Cir. 1989)); see also Tindal v.

---

[13] The Second Amended Complaint does take note of the petition on Change.org, which local news outlets reported as causing a "backlash." (Doc.53 at ¶¶ 30–31.)  But the Second Amended Complaint also alleges that the overwhelming majority of people who signed the petition did not reside in Southwest Florida.  (Id. at ¶ 30.)  This is not enough for the Court to conduct a thorough Pickering analysis on the face of the Second Amended Complaint, let alone one that would result in qualified immunity for the Defendants.

Montgomery Cnty. Comm'n, 32 F.3d 1535, 1540 (11th Cir. 1994).  Any contrary arguments would rely on "facts outside of the [Second Amended] Complaint" and are "therefore premature at this stage of the proceedings."  Id. at *4.  And of course, it has long been established law that a state entity "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."  Id. (quoting Rankin v. McPherson, 483 U.S. 378, 383 (1987)).

In short, the Court will not dismiss the Second Amended Complaint for qualified immunity at this early stage of litigation.  That said, Defendants may again invoke qualified immunity against at summary judgment if they wish.

### C.    Absolute Legislative Immunity

Finally, the individual Defendants claim they are entitled to absolute legislative immunity.  (Doc. 57 at 12.)  "[S]tate and regional legislators are entitled to absolute immunity from liability under [section] 1983 for their legislative activities."  Bogan v. Scott-Harris, 523 U.S. 44, 49 (1998).  "In determining which actions of . . . legislators are protected by the doctrine of absolute legislative immunity, [the Eleventh Circuit] has drawn the line between legislative actions and administrative actions: Absolute legislative immunity extends only to actions taken within the sphere of legitimate legislative activity."  Corn v. City of Lauderdale Lakes, 997 F.2d 1369, 1392 (11th Cir. 1993) (quoting Brown v. Crawford Cnty., 960 F.2d 1002, 1011 (11th Cir. 1992)).

"Employment decisions generally are administrative except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that strike at the heart of the legislative process."  Bryant

v. Jones, 575 F.3d 1281, 1306 (11th Cir. 2009) (quoting Acevedo–Garcia v. Vera–Monroig, 204 F.3d 1, 8 (1st Cir.2000)).  The Supreme Court has explained that in the context of First Amendment retaliation, there is no legally relevant distinction between the termination of employees and contractors.  See generally Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 678–85 (1996).

Besides the fact that Oakes Farms is a contractor, this case appears largely indistinguishable from one involving a retaliatory termination of employment. Decisions to terminate an employee are generally administrative.  Bryant, 575 F.3d at 1306.  For that reason alone, the Court is not prepared to conclude that the individual Defendants are entitled to absolute legislative immunity.

Even if the Court went beyond the simple employee-contractor analogy, Defendants' arguments remain unconvincing.  Legislative actions are those that "reflect[] a discretionary, policymaking decision implicating the city's budgetary priorities and its services to constituents" or involve "the termination of a position," as opposed to "the hiring or firing of a particular employee."  Bogan, 523 U.S. at 45. Conversely, the hallmarks of an administrative decision include whether "the facts utilized in making [the] decision are specific, rather than general, in nature," and whether "the decision impacts specific individuals, rather than the general population."  Crymes v. DeKalb Cnty., 923 F.2d 1482, 1485 (11th Cir. 1991).

Oakes Farms was terminated and replaced with another contractor.  (Doc. 53 at ¶ 60.)  The underlying contract to supply produce was not eliminated from the School District's budgetary priorities, and the decision only had a direct impact on

the parties affected (at least if the facts in the Second Amended Complaint are viewed in the light most favorable to Plaintiffs). Moreover, the facts utilized to make the termination decision were specific to Oakes Farms and its owner, not general. In short, the termination decision at the center of this case—whether it required a public vote by the School Board or not—does not involve the kind of "prospective, legislative-type rules" that are protected by absolute legislative immunity. Bogan, 523 U.S. at 45 (quoting Alexander v. Holden, 66 F.3d 62, 67 (4th Cir.1995)); see also Crymes, 923 F.2d at 1485 (explaining that the mere act of voting "does not necessarily determine" whether legislators were acting in a legislative capacity (citation omitted)).

## III.    State Law Claims

### A.    Florida Constitutional Claim (Count II)

Defendants claim that Count II of the complaint (which alleges a violation of the Florida Constitution's free speech clause) is indistinguishable from Count I and must be dismissed for the same reasons. (Doc. 57 at 16.) Because the Court declines to dismiss Count I, it also declines to dismiss Count II.

### B.    Breach-of-Contract Claim (Count III)

The School District argues that Oakes Farms's breach-of-contract claim should be dismissed because it is cumulative of its claims under section 1983. (Doc. 57 at 16–17.) Redundancy is a specious ground for dismissal. See Wichael v. Wal-Mart Stores E., LP, No. 6:14-cv-579-Orl, 2014 WL 5502442, at *2 (M.D. Fla. Oct. 30, 2014) ("[M]otions to dismiss made under Rule 12(b)(6) only test the validity of a claim, not its redundancy; a redundant claim should not be dismissed as long as it is

valid." (citing <u>Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano</u>, No. 03 Civ. 15(RWS), 2007 WL 1687044, at *10 (S.D.N.Y. June 11, 2007))).  But even courts that use redundancy as a basis for dismissal must analyze whether the two allegedly redundant claims "are based on the same facts, legal duties and injuries." <u>McGee v. District of Columbia</u>, 646 F. Supp. 2d 115, 122 (D.D.C. 2009).

Defendants argue that they terminated Oakes Farms's contract pursuant to the "termination-for-convenience" clause in paragraph 29, which is permitted under the contract.  (Doc. 53-1 at 7.)  Director Ross's notice confirms that the contract was terminated effective July 11, 2020 for convenience.  (Doc. 53-4.)  Defendants proceed from the assumption that such a termination is allowed under Florida law, and therefore Oakes Farms's breach-of-contract claim fails because it must necessarily be duplicative of Plaintiffs' other claims.  (Doc. 57 at 16–17.)  Oakes Farms responds that the "for-convenience" termination was "pretextual."  (Doc. 69 at 12–13.)

Termination-for-convenience clauses are difficult to argue around.  The only plausible exceptions under federal and Florida law are: (1) bad faith, or possibly (2) lack of consideration.  <u>See generally</u> <u>Handi-Van, Inc. v. Broward Cnty.</u>, 116 So. 3d 530, 536–40 (Fla. 4th DCA 2013) (summarizing federal and Florida law).  As to the latter exception, Florida courts have held that "proper notice" is sufficient consideration.  <u>Id.</u> at 539 (collecting cases).  And "proper" notice does not mean that the language of the contract must provide for "advance" notice—contemporaneous notice will suffice.  <u>Vila & Son Landscaping Corp. v. Posen Const., Inc.</u>, 99 So. 3d 563, 568 (Fla. 2d DCA 2012).

After carefully reviewing the Second Amended Complaint, the Court finds that Oakes Farms's breach-of-contract claim encompasses two separate and distinct theories of breach: (1) failure to comply with the seven-day notice provision in paragraph 29, and (2) terminating the contract without "legal cause."

At a minimum, the Court opines that Oakes Farms's first theory is not duplicative and survives Defendants' argument. The contract here specifically provides for seven days' <u>advance</u> notice of the termination-for-convenience, but Oakes Farms appears to have only received <u>contemporaneous</u> notice.[14] Cf. <u>Handi-Van, Inc.</u>, 116 So. 3d at 534 (rejecting lack-of-consideration argument where the defendant gave ninety days' notice as required by the contract); <u>Vila & Son Landscaping Corp.</u>, 99 So. 3d at 568 (rejecting lack-of-consideration argument where the contract provided for contemporaneous notice of termination, and plaintiff received such notice). The second theory, however, presents a much closer question. It is unclear why Oakes Farms believes the termination of the contract—when severed from the lack of timely notice—is an actionable breach. As best the Court can discern, Oakes Farms believes that Defendants' termination for convenience was merely a "pretext" for their alleged violation of the First Amendment, and therefore Defendants either acted in subjective bad faith or breached some kind of implied covenant of good faith and fair dealing.

---

[14] The School District continued to make purchases through June 25 to make use of DOD allocations. See supra note 3. But that appears not to have altered the effective termination date. Viewing the pleaded facts in the light most favorable to Plaintiffs, the Court will not assume that the continued DOD purchases provided Oakes Farms with the equivalent of seven days' notice.

There are several problems with Oakes Farms's position.  For one, it is not even clear that Florida courts recognize a "bad faith" exception to terminations for convenience, as some federal courts do.  See Vila & Son Landscaping Corp., 99 So. 3d at 567 ("[W]e find limited value in these federal procurement cases and look instead to common law contract principles as articulated by Florida's courts."). Even if they did, it is not clear that "pretext" satisfies the exception.  Id. (explaining that bad faith in the federal context means "the government acted with the specific intent to harm the contractor or was motivated by malice or animus" (citing Kalvar Corp. v. United States, 543 F.2d 1298, 1302 (Ct. Cl. 1976))).  And finally, the implied covenant of good faith and fair dealing "cannot be used to vary the terms of an express contract."  Flagship Resort Dev. Corp. v. Interval Int'l, Inc., 28 So. 3d 915, 924 (Fla. 3d DCA 2010).  Rather, it is a "gap-filling" rule that courts use "when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards."  Publix Super Markets, Inc. v. Wilder Corp. of Del., 876 So. 2d 652, 654 (Fla. 2d DCA 2004).  Here, the contract anticipates termination for convenience; such terminations were not beyond "the reasonable expectation of the contracting parties."  Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001) (quoting Barnes v. Burger King Corp., 932 F. Supp. 1420, 1438 (S.D. Fla. 1996)).

In short, it seems Oakes Farms's second theory for breach-of-contract lacks an appropriate legal vehicle.  Accordingly, the Court finds that the Second Amended Complaint fails to state a breach-of-contract claim grounded in the termination of

the contract itself, and any such claim is dismissed without prejudice.  However, the breach-of-contract claim may proceed on Oakes Farms's lack-of-notice theory, which does not rely on the contract's termination and is not duplicative of Plaintiffs' constitutional claims.

## C.    Sunshine Law

In Count IV, Plaintiffs allege that the School District's secret termination of the Oakes Farms contract violated Florida's Sunshine Law, which provides:

> All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation, or political subdivision, except as otherwise provided in the Constitution, including meetings with or attended by any person elected to such board or commission, but who has not yet taken office, at which official acts are to be taken are declared to be public meetings open to the public at all times, and <u>no resolution, rule, or formal action shall be considered binding except as taken or made at such meeting</u>.  The board or commission must provide reasonable notice of all such meetings.

Fla. Stat. § 286.011(1) (2020) (emphasis added).  The Sunshine Law was broadly incorporated into article I, section 24 of the Florida Constitution, which requires "[a]ll meetings of any collegial public body" to be open and noticed to the public. Count IV of the complaint seeks declaratory and injunctive relief against the School District for allegedly terminating Oakes Farms's contract in secret—an action that Plaintiffs allege violated the Sunshine Law.

The School District argues that Count IV does not state a claim because a meeting between individual Board Members and staff (like Superintendent Adkins) is distinct from a meeting of the Board itself.  (Doc. 57 at 18–19); <u>Occidental Chem. Co. v. Mayo</u>, 351 So. 2d 336, 341 (Fla. 1977), <u>receded from on other grounds</u>,

26

<u>Citizens of State of Fla. v. Beard</u>, 613 So. 2d 403, 405 (Fla. 1992).  The School District further argues that a meeting with an official who has been delegated advisory or fact-finding responsibilities (as opposed to decision-making responsibility) is not covered by the Sunshine Law.  (Doc. 57 at 19–20); <u>Sarasota Citizens For Responsible Gov't v. City of Sarasota</u>, 48 So. 3d 755, 762 (Fla. 2010).

Plaintiffs respond that the School District's position presumes too many facts at the pleading stage.  The Court agrees.  The Second Amended Complaint contains two theories of how the Sunshine Law was violated: (1) Superintendent Adkins acted as a liaison between the individual Board Members, polled each of them about whether they agreed with his recommendation to terminate the contract, and took action when it was clear that a majority agreed (Doc. 53 at ¶¶ 114–18); and (2) the School Board delegated its decision-making authority to Superintended Adkins, who then stood in the shoes of the Board and became its alter ego (<u>id.</u> at ¶¶ 119–20).

Viewing the facts in the Second Amended Complaint in the light most favorable to Plaintiffs, both theories are plausible.  The public comments of the Board Members, coupled with Superintended Adkins calling each of them prior to announcing the contract's termination, are sufficient for Plaintiffs to proceed to discovery and ascertain what really happened here.

## IV.    Miscellaneous Arguments

Defendants argue that the School District is immune from punitive damages under section 1983 (which is included in the general prayer for relief in the Second Amended Complaint).  (Doc. 57 at 23.)  Plaintiffs agree, which the Court takes to

mean that they never intended to assert a claim for punitive damages against the School District under section 1983 in the first place. (Doc. 69 at 19.)

Defendants also cite case law for the proposition that prospective injunctive relief against a state official to prevent future constitutional violations may not be requested against them in their individual capacity. (Doc. 57 at 23); Greenawalt v. Ind. Dep't of Corr., 397 F.3d 587, 589 (7th Cir. 2005) ("[S]ection 1983 does not permit injunctive relief against state officials sued in their individual as distinct from their official capacity." (citation omitted)). But see Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad., 788 F. Supp. 2d 950, 959 (D. Minn. 2011) (holding, under unique facts, that injunctive relief against officials in their individual capacity could proceed). At least one district court in the Eleventh Circuit has taken the same position, but the case law it cites in support appears tenuous. See Jones v. Buckner, 963 F. Supp. 2d 1267, 1281 (N.D. Ala. 2013) (citing Brown v. Montoya, 662 F.3d 1152, 1161 n.5 (10th Cir.2011)).

For purposes of this case, however, it appears the injunctive relief requested in the complaint could only be obtained from Defendants in their official capacities anyway. (Doc. 53 at 25 ¶ a); cf. Scott v. Flowers, 910 F.2d 201, 213 (5th Cir. 1990) ("[T]he injunctive relief sought and won by Scott can be obtained from the defendants only in their official capacity as commissioners."). And Plaintiffs never oppose this argument or claim that they are seeking injunctive relief against Defendants in their individual capacities. Accordingly, the Court will take Plaintiffs at their word and assume they are seeking injunctive relief only against

the School District.  This not to say, however, that Plaintiffs will ultimately be entitled to any injunctive relief.

### CONCLUSION

For the reasons above, it is **ORDERED** that Defendants' motion to dismiss (Doc. 57) Plaintiffs' Second Amended Complaint (Doc. 53) is **GRANTED IN PART.** Count III is **PARTIALLY DISMISSED WITHOUT PREJUDICE** to the extent it asserts a breach-of-contract theory based on the contract's termination.  In all other respects, the motion is **DENIED**.[15]

**ORDERED** in Fort Myers, Florida, on May 28, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

---

[15] The Court encourages the parties to strongly consider settlement of this case.  Of course, it is the parties' ultimate decision whether to do so.  But, based on the information currently in the Court record and careful review of the operative complaint, the Court believes it may be in the best interests of all parties involved to do so.

29