UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

OAKES FARMS FOOD &
DISTRIBUTION SERVICES, LLC
AND FRANCIS A. ("ALFIE") OAKES,
III,

       Plaintiffs,

v.                                                                Case No:  2:20-cv-488-JLB-KCD

THE School District OF LEE
COUNTY, FLORIDA, GREGORY
ADKINS, FREDRICK B. ROSS,
MARY FISCHER, DEBBIE JORDAN,
MELISSA W. GIOVANELLI, CHRIS
N. PATRICCA, GWYNETTA S.
GITTENS, BETSY VAUGH,
CATHLEEN O'DANIEL MORGAN,
and JOHN DOE #1,

       Defendants.

_____

## ORDER

     Francis A. Oakes ("Mr. Oakes"), the owner of Oakes Farms Food &

Distribution Services, LLC ("Oakes Farms"), brings this suit against the Lee County

School District ("School District") and certain members of the School District staff

and School Board (collectively "Defendants") after Oakes Farms was terminated

from its contract to provide fresh produce to the School District in June 2020.

     June 2020 was a fraught moment in this nation as the COVID-19 pandemic

was in its early stages and relatively little was known about the virus, and protests

surrounding the death of George Floyd—a black man who died as a result of a police

interaction and use of force—were ongoing.  At this time, and while his company was under a prior contract to provide fresh produce for the School District's lunch program, Mr. Oakes posted on his personal Facebook page comments questioning the legitimacy of the pandemic and criticizing George Floyd, as well as the protesters who took to the streets in the wake of his death.  The post was quickly met with widespread public opprobrium, and within days, School District officials investigated Oakes Farms and terminated its contract with Oakes Farms, ostensibly for Oaks Farms' failure to comply with certain COVID-19-related food handling procedures.

Mr. Oakes and Oakes Farms thereafter brought this suit[1] alleging that Oakes Farms was terminated from the contract with the School District in retaliation for Mr. Oakes's protected speech, violating the free speech clauses of both the United States and Florida Constitutions.  Plaintiffs also allege that Defendants breached their contract with Oakes Farms and violated various Florida's Sunshine Law's provisions while planning to terminate the contract.

Before the Court are three Motions for Summary Judgment: one from Plaintiffs (Doc. 141), one from a now former School Board member—Chris N. Patricca— (Doc. 140), and one from the remaining Defendants, (Doc. 143).  After careful review of the record, the Court GRANTS in part and DENIES in part Ms. Patricca's Motion for Summary Judgment and the remaining Defendants' Motion

---

[1] The operative complaint is Plaintiffs' Third Amended Complaint, which contains five counts.  (Doc. 118).

for Summary Judgment, and the Court DENIES Plaintiffs' Motion for Summary Judgment.

The Court holds that the School District's termination of Oaks Farms' food service contract after Mr. Oakes's June 6, 2020 public speech via his Facebook post on a matter of public concern was not a violation of the First Amendment to the United States Constitution.  Further, as to all individual defendants, they are entitled to qualified immunity and are therefore dismissed from this case with prejudice.  Having fully resolved all federal questions pleaded in the operative complaint, the Court dismisses the remaining counts—all Florida state law claims––without prejudice.  Should they so choose, Plaintiffs may file such claims in Florida state court.[2]

## FACTS

Mr. Oakes started Oakes Farms[3] in 2011 and by 2020, Oakes Farms had grown into a food distribution, food processing, farming, and retail company.  (Doc. 143-9 at 10, 20–21).  At all times relevant, Mr. Oakes was the sole owner of Oakes Farms.  (*Id.* at 11).

In 2020, the School District staff included Defendants Superintendent Gregory Adkins and Director of Procurement, Fredrick Ross, and the School District

---

[2] The Statute of Limitations has not expired on any of Plaintiffs' Florida law claims. *See* Fla. Stat. § 95.11.

[3] While a Plaintiff here is Oakes Farms Food & Distribution Services, LLC, which is a subsidiary of the parent company, Oakes Farms, for ease of reference, Oakes Farms is used throughout this Order to refer solely to the food distribution portion of the company, which contracted with the School District.

was overseen by a seven-member school board consisting of Defendants Melissa Giovanelli, Debbie Jordan, Chris Patricca, Gwynetta Gittens, Betsey Vaughn, Cathleen Morgan, and Mary Fischer.  (Doc 143-1; Doc. 143-2; Doc. 143-11; Doc. 143-10 at 232).

Superintendent Adkins, who began his tenure at the School District in 2015, made it a priority "to ensure that fresh fruits and vegetables were served to our students and that we prioritize local vendors and local farmers, where possible." (Doc. 58-9 at ¶¶ 1, 8).  Oakes Farms began providing fresh food to the School District beginning in 2015.  (Doc. 138-10; Doc. 143-1 at 116–17; Doc. 143-6 at 24–25, 32).  On May 2, 2018, the School District requested bids for the provision of fresh produce to schools within the County.[4]  (Doc. 49-2 at 1).  Oakes Farms "went after the Lee County contract," and on June 26, 2018, the School Board approved Oakes Farms' bid.  (Doc. 143-9 at 19; Doc. 118-1; Doc. 49-1 at 5).

The School Board's meeting minutes from June 26, 2018, at which the School Board approved Oakes Farms' bid, state:

> This bid will be effective for the period of July 1, 2018 to June 30, 2021, at the estimated expenditure of $4,900,000.00 for the first year for the base contract period of July 1, 2018 through June 30, 2019, with renewal options for three additional one year periods, upon the written agreement of the vendor and the District.  Approval authorizes the Superintendent to execute all related documents.

---

[4] The request for bids states, "A recommendation for award will be presented to the Superintendent, and subsequently to the School Board for consideration.  The School Board exercises final award of a contract."  (Doc. 49-2 at 4.)  It further states, "The Board reserves the right to terminate any contract resulting from this invitation at any time and for any reason, upon giving seven (7) days prior written notice to the other party."  (Doc. 49-2 at 7.)

(Doc. 49-1 at 5).  No issues with food safety occurred with Oakes Farms' food distribution service throughout the entirety of the period during which Oakes Farms contracted with the School District.  (Doc. 143-9 at 137; Doc. 138-11.)  In fact, Oakes Farms continuously received rave reviews from School District personnel. (*Id.*)

On March 1, 2020, Governor Ron DeSantis declared the COVID-19 pandemic a public health emergency in the State of Florida.  *See* State of Florida, Office of the Governor, Executive Order, No. 20-51 (March 1, 2020) https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf.  The School District responded by putting "detailed protocols in place over in March 2020 to prepare for ensuring the safety of our students' return to school."  (Doc. 143-4 at 330).  This included "distributing food to feed children through a 'drive up' method or delivery by bus" and issuing publications called "COVID-19 Updates."  (*Id.*)

On June 1, 2020, the School District issued a COVID-19 update, reporting that since the start of the pandemic, there had been nearly 2,000 positive cases of COVID-19 in Lee County and more than 100 deaths attributed to the COVID-19 virus.  (Doc. 143-1 at 330).  The update included several "health notifications" including recommendations that Lee County residents wear masks, social distance, wash hands and use hand sanitizer, disinfect work surfaces and equipment, minimize touching shared equipment, and stay home if they had any cold-like symptoms.  (*Id.*)  Although Lee County's public schools were operating remotely, the School District continued to provide free meals to thousands of its students.  (*Id.*)

The next day, on June 2, 2020, the School Board voted to renew its contract with Oakes Farms for a term of July 1, 2020 through June 30, 2021, representing the final year of its three-year option agreement with Oakes Farms.  (Doc. 118-3). That year-long contract estimated a $6,000,000 expenditure for the purchase of various fresh fruits and vegetables for all District schools.  (*Id.*)  As per the School Board minutes recorded at the initial approval of the Oakes Farms bid, Superintendent Adkins was responsible for executing all documents related to the renewal of Oakes Farms' contract for the July 1, 2020 to June 30, 2021 contract term.  (Doc. 49-1 at 5.)

While the COVID-19 pandemic intensified in the country, a period of racial reckoning was also taking place stemming from the circumstances surrounding the death of George Floyd.  (*See* Doc. 143-3 at 18–19, 21–22, 24, 142–43; Doc. 143-4 at 74–75).  Three days *after* renewing Oakes Farms' contract for the July 1, 2020 to June 30, 2021 period, the School District, on June 5, 2020, posted a letter on its official Twitter account—signed by Superintendent Adkins and the seven members of the School District's school board—commenting on the death of George Floyd. (Doc. 143-1 at 199–200).

The School District's Twitter post stated in part, "The actions that led to the death of George Floyd and the protests that followed have left us overwhelmed with grief and sadness . . . [;] we affirm our resolute commitment to our values of diversity and inclusiveness and condemn racism in all its forms."  (Doc. 143-1 at 200).

6

The next day, on Saturday, June 6, 2020, Mr. Oakes posted his views of the COVID-19 pandemic and the death of George Floyd on his personal Facebook page. This post, which is the speech at issue in this First Amendment retaliation case and refers to both the COVID-19 pandemic and the Black Lives Matters protests as hoaxes, is reproduced in its entirety as follows:

> The COVID19 hoax did not work to bring down our great President and now this . . . the black lives matter race hoax . . . REALLY . . . what else do the disgraceful powers that control this world with their puppets in the media have planned for us in next 5 months?  Is it possible that so many of our fellow American citizens could really be this ignorant?
>
> When I was a young child I vividly remember during church services a sermon that described how there would come a time where many people would not recognize good from evil or truth from blatant lies . . . I remember thinking to myself how could this ever happen?  It seems impossible from the paradigm that I existed in.
>
> Well here we are . . . in the past 3 months I have watched not only OUR country's economy but the entire world economy brought to ruins for no other reason than multitudes of men and women have allowed themselves to be controlled by deceit and fear.  The corrupt world powers and their brainwashing arms of the media have proven the ability to program the masses.
>
> Now only weeks after the COVID programming many of the same lemmings have allowed the media to convince them that the amazing men and women that put their lives on the line every day to protect us are bad but some disgraceful drug addict felon is a hero being paraded around the country.  Can this really be happening??
>
> There is absolutely no dispute that George Floyd was a disgraceful career criminal, thief, drug addict, drug dealer and ex-con who served 5 yrs in prison for armed robbery on a pregnant woman, and spent his last days passing around fake 20's to store owners in Minnesota.  Our new media hero "Gentle George" had two types of heart disease due to the tremendous amount of illegal drugs he was taking daily.  In his autopsy he tested positive for marijuana, Fentanyl, Amphetamine, morphine, methamphetamine, and several others . . . When officer Chauvin responded to a 911 call that someone was passing counterfeit 20s the

7

store owner pointed out Floyd, who was sitting in a car across the street. When officer Chauvin confronted Floyd, and asked him to get out of the car, Floyd refused and was not cooperating with the officer, a 20 year public servant, who was unlucky enough to be the one having to deal with this drug addicted criminal, a true disgrace to our human race that represents all that is wrong with our society. Floyd continued to resist the officers orders during this incident as one would expect from a mindless drug addict. Now the media, Hollywood and many of our disgraceful politicians want you to be outraged that this career criminal drug abusing thug suffered the consequences of a lifetime of bad choices. Unfortunately the liberal mindset that has been instilled in so many of our young generation has taught them to take no personal responsibility for their actions. They have been taught that if they do not success than [sic] they must be a victim. These lost souls without any direction or sense of purpose are so easily manipulated to blame others for their lack of self worth. It is these lost souls with little to no self worth who are the "protesters" that we see looting our stores, burning down our cities, defaming our national monuments and disgracing the great men and women that built this country . . . but I suppose now they finally found a purpose.

As we will likely be facing tough times ahead, I can only pray that these lost souls find a true purpose beyond the blame and deceit that is testing if not ruining the strong fabric of once our great nation.

(Doc. 138-15 at 1–2).

On June 7, 2020, the day after Mr. Oakes published this Facebook post, an internet petition was started by an account called "People of SWFL" on the website, Change.org, stating:

Oakes Farms is a distributor of produce to Collier County and Lee County schools. We are asking that both counties cut ties with Oakes Farms as founder and CEO Alfie Oakes has shared racist views about the murder of George Floyd on his Facebook page.

(Doc. 138-16). The petition subsequently garnered thousands of signatures. (*See id.*)

Later that day, Defendants received several messages from constituents and School District staff members asking the School District to terminate its contract

8

with Oakes Farms.  For example, a School District teacher emailed School District school board members, including Defendant Ms. Patricca, "respectfully request[ing] that the school board and superintendent reconsider our district's contract with Oakes Farms" because Mr. Oakes's "racist, anti-black opinions directly oppose our district's mission of providing inclusive education for students of all abilities, needs, and backgrounds." (Doc. 138-17).  Ms. Patricca forwarded this email to Kathy Dupuy-Bruno, an attorney for the School District school board, adding the message, "Hi!  Can we legally get out of this contract?" (*Id.*)  Ms. Dupuy-Bruno responded the next day, "Yes, we have the right to terminate with 7 days' notice." (Doc. 138-18).

School staff including Superintendent Adkins, Ami Desamours, the Chief Financial Officer of the School District (who is not a Defendant here), and Mr. Ross were also concerned that Oakes Farms was not taking the COVID-19 pandemic seriously because of Mr. Oakes's statement that COVID-19 was a "hoax." (*See* Doc. 58-9 at ¶¶ 19, 33–38; Doc. 143-1 at 63–64; Doc. 143-11 at 28, 114).

Attempting to address such concerns, Ms. Desamours and Mr. Ross began an investigation into the COVID-19 food safety protocols implemented at Oakes Farms. (*See* Doc. 49-8 at ¶¶ 14, 18–20; Doc. 138-2 at 20).  Mr. Ross called the President of Oakes Farms' distribution business, Anthony High, and requested information about the company's COVID-19 protocols. (Doc. 143-6 at 41).  Mr. High responded with a detailed account of COVID-19 protocols printed on sheets with the letterhead of another company—Marjon Foods—which Mr. High indicated was a subsidiary of Oakes Farms. (*Id.* at 60, 77–78, 196; Doc. 143-2 at 21–22; Doc. 143-10 at 141–43).

9

Mr. High clarified subsequently that he used the Marjon Foods documents because Marjon Foods had recently been audited by the USDA, and therefore all of the information for the company had already been prepared and was readily available. (Doc. 54 at ¶¶ 12–13).

Ms. Desamours and Mr. Ross discussed the documentation they had received from Mr. High and determined that it "was inadequate." (Doc. 143-2 at 22). Mr. Ross explained, "[I]n my experience as a procurement professional, when a vendor sends you their protocol, they send it on their documentation, on their letterhead. It has their information in it and within it, and that wasn't the case here." (Doc. 143-11 at 49). And Superintendent Adkins testified that he viewed "this document on the letterhead of a completely different company, coupled without any representation or assurance that Oakes Farms was following any safety requirements, to be a completely insufficient assurance that Oakes Farms was taking necessary precautions to protect the health, safety, and welfare of our approximately 95,000 students." (Doc. 143-1 at 267).

Mr. Ross called Mr. High and tried to find out more information about Oakes Farms' COVID-19 safety protocols, but he found Mr. High's responses unsatisfactory. (Doc. 143-11 at 47–48, 53; Doc. 143-2 at 22.) As Mr. Ross testified, he "ha[d] no way of qualifying if the" documentation provided by Mr. High containing the Marjon protocols was "sufficient." (Doc. 143-11 at 48–49). Mr. Ross then reported to Ms. Desamours that Oakes Farms did not have sufficient COVID-19 food safety protocols. (Doc. 143-11 at 53). As Ms. Desamours testified, "the

bottom line was, when we asked for representations of what their COVID safety protocols were at facilities that we were receiving food from, including Oakes Farms facilities in—you know, their main location, we did not receive the information that we requested." (Doc. 138-2 at 33).  Ms. Desamours added, "[w]e believed that the . . . time and effort that we put in was sufficient to be able to make a decision in the best interest of . . . our students' and staff's safety." (*Id.* at 53.)

On June 10, 2020, Ms. Desamours discussed the findings of the investigation with Superintendent Adkins and the School District's Chief of Staff, Lauren Stillwell, and recommended that the contract with Oakes Farms be terminated. (Doc. 143-2 at 24, 42–43).  At this meeting, Superintendent Adkins also determined that he wanted to terminate the contract with Oakes Farms.  (Doc. 138-1 at 58, 78; Doc. 143-13 at 40).

Later in the evening of June 10, Ms. Stillwell arranged phone calls between her, Superintendent Adkins, Ms. Desamours, Ms. Dupuy-Bruno, and each of the School Board members, individually, regarding the Oakes Farms contract.  (Doc. 143-13 at 143–45).  During these calls, on June 11, 2020, Superintendent Adkins "told them . . . we were terminating the Oakes Farms contract because of concerns that we had about the safety of the . . . food." (Doc. 143-1 at 92, 97).  A memorandum prepared by Ms. Stillwell summarizing these various meetings reported that all members of the school board "recommend[ed] termination" of the Oakes Farms contract.  (Doc. 143-13 at 147–48).

That same day, Mr. Ross called Mr. High to alert him that the contract with

Oakes Farms was being terminated for convenience.  (Doc. 54 at ¶ 16).  Moments after this call, the School District tweeted from its official Twitter account, "The School District of Lee County has severed ties with Oakes Farms.  The District will soon be working with other suppliers to ensure that fresh fruits and vegetables continue to be provided to our students."  (Doc. 138-30).

Later that day, Mr. Ross wrote a letter to Mr. High announcing that the final delivery date of the contracted fruits and vegetables from Oakes Farm to the School District would be on June 25, 2020, as follows, "Per our conversation this morning, and in compliance with the General Conditions of the ITB, Section 29 – Cancellation / Termination, it has been determined that it is in the best interest of the District to terminate the contract for convenience . . . effective June 11, 2020. The last delivery date of ordered products will be June 25, 2020."  (Doc. 143-6 at 245).

Between June 11 and June 25, 2020, the School District's school board and staff held several meetings in which they addressed community concerns about the termination of the Oakes Farms contract and to determine who the next supplier of fresh produce would be for the School District.  (*See* Doc. 58-5 at 2; Doc. 58-6; Doc. 138-1 at 81–82; Sch. Dist. of Lee Cnty., *School Board Workshop: June 12, 2020*, YOUTUBE, at 3:33:50 (June 12, 2020), https://www.youtube.com/watch?v=BOgGcQzfmfYube (last accessed Oct. 13, 2023); Sch. Dist. of Lee Cnty., *School Board Workshop: June 23, 2020*, YouTube, at 0:49:40 (June 23, 2020) https://www.youtube.com/watch?v=DNZfgZiu38E - YouTube (last

accessed October 13, 2023).).

At the June 23, 2020 meeting, Superintendent Adkins stated, "the contract termination . . . was done relating to the health, safety, and welfare for our students."  https://www.youtube.com/watch?v=DNZfgZiu38E - YouTube at 0:50-00. Later during this meeting, the School Board voted on a motion introduced by Ms. Morgan and Ms. Giovanelli, which stated:

> "[o]n June 2, 2020, the Board approved expenditures for . . . fresh produce . . . . On June 11, 2020, the District made the decision to terminate the contract with the awarded vendor . . .. US Foods, Inc., is able to provide uninterrupted service of fresh produce to all District locations, as they are already established with deliveries of other food and non-food products.  It is recommended the Board approve the increase to the previously Board approved estimated expenditure . . . for a total estimated expenditure of $23,500,000.00, with US Foods, Inc., for the period of July 1, 2020 through June 30, 2021, with an option to cancel if deemed to be in the best interest of the District."

(Doc. 58-7 at 2).  The School Board approved this motion unanimously, ratifying the contract with US Foods for the fresh produce bid that had originally been awarded to Oakes Farms for that same July 1, 2020 to June 30, 2021 time period.  (*Id.*)

Plaintiffs subsequently filed suit in this Court for violations of the free speech clauses of the First Amendment to the United States Constitution (Count I) and the Florida Constitution (Count II) against all Defendants, and breach and repudiation of contract against the School District (Count III).  Plaintiffs also allege violations of Florida's Sunshine Laws: Article I, Section 24 of the Florida Constitution and Florida Statutes § 286.011(1) against the School District stemming from: Defendants' deliberations regarding the termination of the Oakes Farms Contract (Counts IV); the School District's official statement regarding the death of George

Floyd (Count V); and, the School District's decision to hire U.S. Foods to replace Oakes Farms as the distributor of fresh produce for the district (Count VI).  (*See* Doc. 118).[5]

Before the Court are cross-motions for summary judgment.  Plaintiffs move for summary judgment against the School District on their First Amendment claim (Count I), breach of contract claim (Count III), and sunshine law claims (Count III, Count IV, and Count V).  They ask the Court to leave any liability of the individual defendants for trial.  (Doc. 141 at 5).  The School District moves for summary judgment on *all* counts.  Superintendent Adkins, Mr. Ross, and the School Board members move for summary judgment on all counts on qualified and legislative immunity grounds.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is genuine if a reasonable jury could return a verdict for the nonmoving party.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).  A fact is material if it may affect the outcome of the case under the applicable substantive law.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

---

[5] Plaintiffs mistakenly allege two Count Vs, both purported violations of Florida's Government-in-the-Sunshine Laws.

The party seeking summary judgment bears the initial burden of demonstrating to the Court, by reference to the record, that there are no genuine issues of material fact to be determined at trial and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). On a motion for summary judgment, the Court views the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). If the Court determines that a reasonable fact finder could draw more than one inference from the facts, creating a genuine issue of material fact, summary judgment should not be granted. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988).

## **DISCUSSION**

### I.   **The School District is entitled to summary judgment as to Plaintiffs' First Amendment retaliation claim.**

Plaintiffs move for summary judgment on their First Amendment retaliation claim against Defendant School District, arguing that there is no genuine dispute of material fact that the School District unconstitutionally terminated its contract with Oakes Farms as a result of Mr. Oakes's Facebook post. (*See* Doc. 141 at 23). Defendant School District counters that Plaintiffs' First Amendment retaliation claim fails because Plaintiffs have not meet their burden under *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205 Will Cnty., Ill.*, 391 U.S. 563 (1968). (Doc. 155 at 13). Plaintiffs assert that *Pickering* does not apply to them. (Doc. 141 at 28–29). For the reasons below, the Court finds that *Pickering* does apply to Plaintiffs, and Plaintiffs have not met their burden under *Pickering* because the *Pickering*

15

balancing test weighs in favor of Defendant School District. Accordingly, summary judgment is due to be granted in favor of the School District as to Plaintiffs' First Amendment retaliation claim.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. "The Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019) (citation omitted).

While it is true that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore,* 547 U.S. 250, 256 (2006)), "when individuals enter into government employment or contracts, they accept certain restrictions on their freedom of speech as part of the deal," *Fulton v. City of Phila., Pa.*, 141 S. Ct. 1868, 1878 (2021). This is because "a public employee's right to speak as a private citizen is not absolute." *Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023). Instead, as the Supreme Court determined more than fifty years ago, "[t]he state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering* 391 U.S. at 568 (1968). Specifically, a public employee's interests are limited by the state's need to preserve efficient governmental functions such that the First Amendment protection of a public

16

employee's speech depends on a careful balance "between the interests of the [employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. This balancing test is known as the *Pickering* test. *See Williamson v. Ala. Dept. of Mental Health and Mental Retardation et al.*, No. 21-13274, 2023 WL 5287873, at *3 (11th Cir. Aug. 17, 2023).

Here, Plaintiffs argue that the *Pickering* test does not apply to the facts of this case because Mr. Oakes was not an employee of the School District, and Oakes Farms did not engage in any speech. (Doc. 141 at 29–30.) This argument is misguided because it is well-established that the *Pickering* test applies to individuals, like Mr. Oakes, who own and operate businesses that contract with the government. *See Bd. of Cnty. Cm'rs, Wabaunsee Cnty., Kan v. Umbehr*, 518 U.S. 668, 684–85 (1996). In fact, the parallels between *Umbehr* and Plaintiffs' version of the events in this case are notable. In *Umbehr*, an individual who owned and operated a trash hauling business that contracted with a Kansas County spoke out at county commission meetings and wrote letters and columns in local newspapers about a variety of topics of public concern. *Id.* at 671. Upset with Mr. Umbehr's speech, the County terminated its contract with Mr. Umbehr's trash hauling business. *Id.* Mr. Umbehr then brought suit for First Amendment violations alleging that his company had been terminated from its government contract in retaliation for his speech. *Id.* at 672. Affirming the Tenth Circuit's decision that

17

"an independent contractor is protected under the First Amendment from retaliatory governmental action, just as an employee would be," the Supreme Court held that the extent of that protection is to be determined in accordance with the balancing test used to determine government employees' First Amendment rights in *Pickering*. *Id.* at 678–79, 686. Accordingly, contrary to Plaintiffs' contentions, the *Pickering* test is applicable to the facts of this case.

Applying the *Pickering* test, the Eleventh Circuit has held that "to prevail on a First Amendment claim of unlawful retaliation, an employee must make three showings." *Green*, 73 F.4th at 1263. The employee must show that (1) his speech is on a matter of public concern; (2) his free speech interest outweighs the employer's interest in prohibiting the speech to promote the efficiency of its public services; and (3) the speech played a substantial role in the employer's decision to discharge the employee. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759–60 (11th Cir. 2006) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)). "The first two inquiries are questions of law for the Court." *See Green*, 73 F.4th at 1263. In answering these questions, the Court is to "consider the manner, time, and place of the speech, plus the context in which it arose." *Williamson*, No. 21-13274, 2023 WL 5287873, at *3. Further, "when an employee violates a specific rule or regulation to which he is subject, the government employer's position is strengthened." *Id.*

### 1. Mr. Oakes spoke as a citizen on a matter of public concern.

To reiterate the standard articulated above, for Mr. Oakes to establish a prima facie case of First Amendment retaliation, he must first show that he spoke

on a matter of public concern.  *Battle*, 468 F.3d at 759–60.  For speech to be deemed a matter of public concern, it must "be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest."  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).  Importantly, whether speech is shocking or inappropriate is irrelevant to whether it concerns a public matter.  *See, e.g.*, *Morris v. Crow*, 117 F.3d 449, 456–58 (11th Cir. 1997) (holding that even speech that contains an "embarrassing, vulgar, vituperative, ad hominem attack" can touch on a matter of public concern).

Here, the Court finds that Mr. Oakes's comments regarding the COVID-19 pandemic, media bias, the death of George Floyd, and Black Lives Matter protests were made as a citizen and pertained to matters of public concern.  *See Snyder*, 562 U.S. at 453.  These were issues that were highly newsworthy, and at the time were the focus of significant public concern, not just in the Southwest Florida community but around the country.  While Mr. Oakes's speech was abrasive and offensive to many, several other courts in this circuit have held that speech of a more vituperative nature than Mr. Oakes's was on a matter of public concern.  *See, e.g.*, *Darlow v. City of Coral Springs*, No. 21-CIV-60083-RAR, 2021 WL 3514826, at *3 (S.D. Fla. Aug. 10, 2021), *aff'd sub nom. Darlow v. Babineck*, No. 21-13020, 2022 WL 15345444 (11th Cir. Oct. 27, 2022) (holding that plaintiff spoke as a citizen and that his speech involved a matter of public concern where he "posted a meme in a private Facebook group that depicted George Floyd with pink skin"); *see also Duke v. Hamil*, 997 F. Supp. 2d 1291, 1300 (N.D. Ga. 2014) (finding that plaintiff's

Facebook post containing an image of the Confederate flag and the text, "It's time for a second revolution" constituted speech on a matter of public concern because "it [was] plausible the Plaintiff was expressing his dissatisfaction with Washington politics."). Even more, the fact that Mr. Oakes made these comments on his personal— *but publicly viewable*—Facebook page indicates that his comments were public indicates that they were matters of public concern. *See, e.g., Carney v. City of Dothan*, 158 F. Supp. 3d 1263, 1286 (M.D. Ala. 2016) ("The fact that [plaintiff] lodged these complaints on a public Facebook page, an undeniably open forum, bolsters the finding that they were public in nature."). Accordingly, there is no genuine dispute of material fact that the speech was made as a citizen on a matter of public concern. As such, Mr. Oakes has made the first showing required to establish a First Amendment retaliation claim. *See Battle*, 468 F.3d at 759-60

## 2. Balancing Mr. Oakes's interests against the School District's interests.

Having established that Mr. Oakes's speech pertained to a matter of public concern, Mr. Oakes must next show that his First Amendment interests outweigh "the interest of the state . . . in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568. As previously noted, the *Pickering* balancing test is a question of law for the Court to decide. *Green*, 73 F.4th at 1263. "The key question is whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 1267 (internal citation omitted).

The Eleventh Circuit has instructed that the following factors are helpful towards answering this question: "(1) whether the *speech at issue* impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Morales v. Steirheim*, 848 F.2d 1145, 1149 (11th Cir. 1988); *see also Rankin v. McPherson*, 483 U.S. 378, 388, (1987) ("In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose").  The Supreme Court has found "whether the statement . . . has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise" are all pertinent considerations with respect to the balancing test. *Rankin*, 483 U.S. at 388.  "State interests weigh heavily where an employee's speech thwarts the mission of the agency or impedes the performance of the speaker's duties." *Morales*, 848 F.2d at 1149.

Importantly, "a genuine potential for speech to harm a [school district]'s reputation also justifies an employer taking action *before* that harm is realized." *See Duke*, 997 F. Supp. 2d at 1302 (emphasis added).  As the Supreme Court held in *Connick*, "we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."  461 U.S. at 152; *Green*, 73 F.4th at 1268 (explaining that both the Supreme Court and Eleventh Circuit "have given

substantial weight to government employers' *reasonable predictions* of disruption,

even when the speech involved is on a matter of public concern") (emphasis in

original) (quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).  The Supreme

Court's First Amendment retaliation precedent is clear in recognizing that

government bodies need not always wait to see what unfolds in the wake of

controversial speech before they act upon such speech.  *See id.*; *see also Waters v.

Churchill*, 511 U.S. 661, 674 (1994) ("Doubtless some speech is sometimes

nondisruptive; doubtless it is sometimes of value to the speakers and the listeners.

But we have declined to question government employers' decisions on such

matters"); *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1288 n.31 (11th Cir. 2006)

("Here, even assuming [plaintiff]'s speech had public value as satirical speech, we

decline to question the County's decision to terminate [plaintiff]'s part time

employment with HTV based on its determination that the speech was highly

offensive and potentially disruptive.").

Here, the School District argues that Mr. Oakes's speech affected its ability to

efficiently administer its services in three ways.  First, from a health perspective,

the School District argues that Mr. Oakes's speech—namely that the COVID-19

pandemic was a "hoax"—threatened to diminish "[t]he public's trust in food safety

for children during a pandemic," augmented "the perceived threat of COVID-19

spread," undermined the School District's "desire to ensure the safety of the food

supply,"  and disrupted school operations by causing the School District to worry

about "COVID spreading to staff, kids, parents and care-givers."  (Doc. 155 at 25).

22

Second, from a pedagogical perspective, the School District has introduced evidence that Mr. Oakes's speech contradicted the messages of inclusion and anti-racism that the School District was promoting to its students. And third, from a school safety perspective, the School District has introduced evidence that Mr. Oakes's speech caused protests outside of schools in the district as well as threats to School Board members, which caused School Board members to fear for their safety. Each will be addressed in turn.

## A. Health concerns

The School District is responsible for providing "proper attention to health, safety, and other matters relating to the welfare of" the approximately 95,000 students in Lee County. Fla Stat. § 1001.42(8)(a); (Doc. 143-1 at 26). "[I]n a public school environment[,] . . . the State is responsible for maintaining discipline, health, and safety." *Bd. of Educ. v. Earls*, 536 U.S. 822, 830 (2002). As the Eleventh Circuit has explained, while schools do not "have carte blanche . . . when school authorities have prudently assessed and addressed an issue that affect student welfare, we should pay attention." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 802 (11th Cir. 2022).

Here, the School District has introduced ample evidence that it was concerned with the potential health risks posed by Mr. Oakes's apparent disregard for the severity of COVID-19.

First, "very little was known at the time COVID-19 first emerged as a significant health risk," but as it became increasingly clear that COVID-19 "was

extremely virulent" and "cause[d] acute respiratory illnesses," Superintendent

Adkins "knew . . . [he] needed to put in place safety precautions for the benefit of

the District students and staff." (Doc. 143-1 at 265). Superintendent Adkins

testified that, "[b]ecause of the significant danger COVID-19 poses to all people, the

District put detailed protocols in place beginning March 2020 to prepare for

ensuring the safety of our students' return to school." (Doc. 143-1 at 266).

Superintendent Adkins added: "[t]he decisions I make impact the lives of our

students, and the lives of their families.  I have to err on the side of safety,

particularly during a health crisis pandemic." (*Id.*)

Beginning in March 2020, the School District "w[as] distributing food to feed

children through a 'drive up' method or delivery by bus." (Doc. 143-1 at 266).  In

June 2020, the Lee County School District "community was experiencing increased

rates of COVID-19 transmission . . . which added to the District's concern." (Doc.

143-1 at 268).  The School District also issued "COVID-19 Updates" which "detailed

the number of students served and meals served . . . [and] provided detailed

requirements for staff on how to protect themselves and others from the spread of

COVID-19. (Doc. 143-1 at 266).  In one of these "COVID-19 Updates" from June 1,

2020, for example, the School District reported that there were 56,830 cases of

COVID-19 in Florida (including 1,943 cases of COVID-19 in Lee County), and there

had been 2,460 deaths from COVID-19 in Florida (including 105 deaths in Lee

County). (*Id.* at 330).  The COVID-19 Update for June 1, 2020 also described how

the School District would "provide free meals to children 18 years old and younger"

on Monday through Friday at "more than 40 meal distribution sites" throughout the summer. (*Id.* at 331). The Update further provided that the lunch program "sites will use the same cleaning and safety protocols in place since March to prevent the spread of COVID-19." (*Id.*) As of June 1, 2020, the School District had served 1,185,612 meals to students since March 2020, and the School District was serving more than 12,000 students per week. (*Id.* at 330).

Thus, as a threshold matter, the record evidence reflects that in June 2020, (1) School District officials believed that COVID-19 was a dangerous, highly transmissible disease; (2) hundreds of people had died from COVID-19 in Lee County; (3) the School District was providing thousands of free meals to children each week; (4) the School District followed cleaning and safety protocols when providing meals to children; and (5) the School District had committed to providing free meals to children throughout the summer.

In this context, just five days after the School District's June 1, 2020 COVID-19 Update, Mr. Oakes posted on his personal Facebook calling COVID-19 a "hoax," expressing that the COVID-19 pandemic was "planned" by "the disgraceful powers that control this world with their puppets in the media." (Doc. 138-15 at 1). Mr. Oakes further stated that he believed people could not recognize "blatant lies" regarding COVID-19, and added, "in the past 3 months I have watched not only OUR country's economy but the entire world economy brought to ruins for no other reason than multitudes of men and women have allowed themselves to be controlled by deceit and fear." (*Id.*)

25

Mr. Oakes's comments evinced, at the very least, skepticism, about the severity of the COVID-19 pandemic, leading many School District officials to believe that Mr. Oakes was not up to the task of safely providing fresh fruits and vegetables for the School District's students through his company, Oakes Farms. As Superintendent Adkins stated, "Oakes Farms' perceived lack of concern regarding the easy transmission of COVID-19 and Mr. Oakes' belief that COVID-19 is not real, in light of the fact Oakes Farms delivers food products to school children, does not comport with the District's concerns for the health, safety, and welfare of the children of our community and the community at large." (Doc. 143-1 at 267–68). Superintendent Adkins added, "Oakes Farms produces . . . fresh food and vegetables for [ ] students. What I'm concerned about with that contract has to do with the safety of . . . the food that comes in," and "[i]f [I] think a company is not taking [the COVID-19 pandemic] seriously, I have to be concerned about the safety of our children." (Doc. 143-1 at 64, 149).

Furthermore, staff members were concerned with Oakes Farms' COVID-19 precautions as a result of Mr. Oakes's Facebook post. For example, Joan Downen, who led a local teachers' group, emailed Ms. Gittens with the subject "info as requested" including a link to an article about the lack of COVID-19 precautions taken at Oakes Farms. Ms. Downen wrote, "This is the #1 reason he should not be a vendor to the school. If he doesn't take Covid serious, is he infecting our kids?" (Doc. 138-5 at 130). And members of the School District community unearthed an article from April 2020 in which Oakes Farms Vice President Steve Veneziano

26

called COVID-19 "absolutely nothing" and said coverage of the pandemic by the media was "an attack on this country." (Doc. 143-6 at 199).

Oakes Farms was also unable to confirm that it was taking precautions to ensure that it was not transmitting COVID-19 to the students via its produce deliveries. Instead of sending information about Oakes Farms Food & Distribution Services, LLC, which was the entity responsible for providing fresh produce to the School District, Mr. High sent information to Mr. Ross about Marjon Specialty Foods' COVID-19 precautions. (*See* Doc. 143-1 at 366). Further, nothing on the documents produced by Mr. High with "Marjon Specialty Foods" letterhead mentioned either Oakes Farms or providing fresh fruits and vegetables to the School District. (*See id.*). As Mr. High testified, in 2020, Marjon was one of *fifty or sixty* different vendors providing fresh fruits and vegetables to the Oakes Farms warehouse. (Doc. 143-6 at 38). Marjon contributed some percentage—Mr. High was not sure of the exact percentage—of the fresh produce to the Oakes Farms warehouse. (Doc. 143-6 at 37). But, as Mr. High testified, none of the food provided by Marjon was delivered directly from Marjon to the School District; instead, it all passed through Oakes Farms. (*Id.* at 29). Thus, even though Marjon was taking precautions, there is no indication that Marjon's precautions were also taken at Oakes Farms or that Marjon was supplying even ten percent of the produce that Oakes Farms ultimately provided to the School District. Furthermore, the USDA "Vendor Verification" provided by Marjon indicates that Mr. High was *not* the designated vendor contact for the facility audited by the USDA and that the Marjon

27

facility site audited was in Plant City, Florida, in Hillsborough County.  (*Id.* at 223).
Thus, there is no record evidence that the COVID-19 precautions taken at Marjon
had an effect on any or all of the fresh produce provided by Oakes Farms to the
School District.  Simply stated, the record evidence indicates that they are distinct
business operations and Marjon is but one of as many as sixty vendors that provides
Oakes Farms fruits and vegetables.

   In sum, viewing the health-related evidence in the light most favorable to
Plaintiffs, as the Court must, the *Pickering* scales are tipped in the School District's
favor.  The School District did not need to wait for a COVID-19-related illness to
occur from the fresh produce provided by Oakes Farms before taking action to
prevent that harm from occurring.  *See Duke*, 997 F. Supp. 2d at 1302.  Given how
little was known about COVID-19 in June 2020, the School District's concern that
COVID-19 could be transmitted from a food distribution facility, which it believed
did not have adequate COVID-19 safety precautions was a "reasonable prediction of
disruption."  *See Green*, 73 F.4th at 1268.  The Court therefore concludes that the
School District's interests in promoting the efficiency of its free meal program and
the health of its students outweighed Mr. Oakes's free speech interest.

## B. Disruption of operations

   Even if the health concerns raised by the School District were not sufficient
on their own to tip the *Pickering* balance in favor of the School District, the School
District has also introduced evidence that Mr. Oakes's controversial, politically
charged speech damaged the School District's reputation with the public and caused

disruptions to school operations.

First, considering the time, place, and manner of Mr. Oakes's speech, as the Court is required to do in the *Pickering* balancing test, *see Morales*, 848 F.2d at 1149, the Court notes that even though Mr. Oakes's Facebook post was made on a Saturday, when the School District was not serving free meals to students, it was visible to thousands of people on Facebook, including many in the community the School District serves.  A screenshot of Mr. Oakes's Facebook post, taken just one day after Mr. Oakes published it, reflects that 1,400 people had reacted to it, nearly 3,000 people had commented on it, and it had been shared 877 times.  (Doc. 138-7 at 336–37.)  This large audience of individuals "illustrates the very gamble individuals take in posting content on the Internet and the frequent lack of control one has over its further dissemination."  *Duke*, 997 F. Supp. 2d at 1302.

The audience for Mr. Oakes's post only grew in light of the public outcry that it elicited.  An online petition was circulated after Mr. Oakes's Facebook post and signed by more than 17,000 individuals, requesting that the School District sever ties with Oakes Farms.  *See* People of SWFL *Cut Ties with Oakes Farms*, CHANGE.ORG https://www.change.org/p/cut-ties-with-oakes-farms (last accessed October 13, 2023).

Consistent with this petition, school board members received "a ton of e-mails and letters and phone calls" from constituents complaining about Mr. Oakes's Facebook post.  (*See* Doc. 143-5 at 60, 84)  At least one teacher wrote the members of the school board requesting that the Oakes Farms' contract be terminated and

29

stating that Mr. Oakes's "racist, anti-black opinions directly oppose our district's mission of providing inclusive education for students of all abilities, needs, and backgrounds." (Doc. 143-14 at 251). A parent of a School District student emailed the school board and Superintendent Adkins stating, "Alfie Oakes is the owner of Seed to Table and a BLATANT RACIST . . . I urge you and the school board to immediately end the District's contract with Seed to Table. We are better than this and our children deserve better than this." (Doc. 143-5 at 255). And a resident of Lee County wrote to the school board stating, "This is systemic racism at its core. It is not a value which the Lee County School System should endorse with contracts with this organization or individual. Please consider this appeal as you meet with your board members and review this food contract." (Doc. 138-7 at 334). These communications are a clear indication of disruption to the School District, tipping the *Pickering* scales in favor of the School District. *See McCullars v. Maloy*, 369 F. Supp. 3d 1230, 1234 (M.D. Fla. Mar. 25, 2019) (finding that *Pickering* balance weighed in favor of government where plaintiff's Facebook posts caused the office's phones to be "constantly ringing with citizens complaining about [p]laintiff's Facebook posts" and "citizens calling the [office] were upset, with some people crying while others used profanity to express their outrage" and the "comments were largely characterized by concerned citizens as racist"); *see Doggrell v. City of Anniston, Alabama*, 277 F. Supp. 3d 1239, 1259 (N.D. Ala. Sept. 29, 2017) (finding that *Pickering* balance weighed in favor of government where the government agency "received numerous complaints and its Facebook account—used to

communicate with the community . . . had to be shut down.").

In addition to the communications to the School District staff and school board, protests took place in Southwest Florida in the wake of Mr. Oakes's Facebook post.  For example, protests took place outside of the main School District administrative building demanding that the School District terminate the contract with Oakes Farms.  (Doc. 143-4 at 122–25; 143-5 at 200; Doc. 138-28 at 1).  Another protest took place outside of Mr. Oakes's grocery store in Naples, Florida—located in Collier County, immediately south of Lee County in Southwest Florida—led by Lee County citizens who aimed to "show Oakes Farms that their gentrification, abuse, and bigotry are no longer welcome in our community," and more than 500 people RSVPed to attend.  (Doc. 138-21 at 7).  A community activist was quoted in a local newspaper as saying that her organization was "targeting" organizations that used Oakes Farms as a supplier, asking that they stop using Oakes Farms and showing up at those businesses who refused to "make sure [their] voices are heard." (Doc. 138-32 at 4).  In response, Mr. Oakes organized a *counter protest* at his retail store in Naples, Florida, Seed to Table, stating, "Please come show your support for [Collier County Sheriff's Office], the rule of law and ALL lives matter at Seed to Table . . . this Saturday!"  (Doc. 138-21 at 9).   Protests, and even the threat of protests, weigh in favor of the government's legitimate interest in avoiding disruption.  *See Snipes v. Volusia Cnty*, 704 F. App'x 848, 852–53 (11th Cir 2017) (holding that *Pickering* balance weighed in favor of government where the government "demonstrated only a reasonable possibility that [rallies or protests]

would occur" and an organizer testified that "if [plaintiff] had not been fired, 'I certainly think that we would have probably moved forward with some sort of either demonstration or action'"); *see McMullenv. Carson*, 754 F.2d 936, 940 (11th Cir. 1985) (finding that *Pickering* balance weighed in favor of government where there were strong community protests "create[ing] an understandably adverse public reaction that seriously and dangerously threaten[ed] to cripple the ability of the law enforcement agency to perform effectively its public duties"); *see McCullars*, 369 F. Supp. 3d at 1240 (finding that *Pickering* balance weighed in favor of government where "the threat of protests loomed").

The School District was also under significant scrutiny from the media. School District staff members expressed concern that local news coverage of the tensions between Oakes Farms and the School District brought unwanted attention and scrutiny to the School District. (*See* Doc. 143-5 at 240; Doc. 143-6 at 217–19; Doc. 138-6 at 33–35). Newspaper reports described the School District as "fac[ing] a backlash . . . for either past or present business ties with Oakes Farms following a Facebook post by its owner." (Doc. 138-21 at 2). School Board members held a meeting at which they discussed how they planned to handle media inquiries. (*See* Doc. 143-13 at 54–55). And Ms. Stillwell testified that the urgency to get a notice out to the public that the School District was terminating its contract with Oakes Farms was caused by pressure from the media to answer questions about the School District's plans with respect to Oakes Farms. (Doc. 143-12 at 67). Unwanted media attention can also weigh in favor of government interests where, as here,

government employees were pulled away from their standard duties to handle media inquiries. *See McCullars*, 369 F. Supp. at 1234, 1237 (finding that *Pickering* balance weighed in favor of government where government office had "media converging outside the building" and "the media was aggressively covering the story"); *see also Maples v. Martin*, 858 F.2d 1546, 1554 (11th Cir. 1988) (finding that *Pickering* balance weighed in favor of government where plaintiff's speech "subject[ed] internal administrative policies to public scrutiny . . . [and thereby] distracted both students and faculty from the primary academic tasks of education and research").

Ms. Gittens, who was "the only black person" on the school board, (Doc. 138-5 at 49), was quoted frequently in the local press, and testified that she felt like she had been placed in a particularly precarious situation given her race. (Doc. 138-6 at 275, 177–78). As Ms. Gittens stated, "I guess they assumed that because I was the only black person on the board, that I was the purveyor of black power and, therefore, I was wrong. And I received statements like, well, we can just tar and feather and hang her and get rid of her." (Doc. 138-5 at 49). The threats made Ms. Gittens feel so unsafe that she contacted the Lee County Sheriff's Office who put her house under surveillance. (*Id.* at 50). Causing School Board members to feel threatened is a clear disruption to the operations of the School District clearly weighing in favor of the School District in the *Pickering* balance. The School District did not need to wait on threats against School Board members to be acted upon before taking action. *See Duke*, 997 F. Supp. 2d at 1302 ("[A] genuine

potential for speech to harm a [school district]'s reputation also justifies an employer taking action *before* that harm is realized"); *Connick*, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

In sum, the Court finds that the record evidence demonstrates that Mr. Oakes's speech caused significant disruptions to the School District's operations as protests proliferated, complaints filled the individual Defendants' email inboxes, the local press hounded the School District representatives for comments, and one School Board member was threatened.  "The obvious disruptive potential of [Mr. Oakes]'s statements . . . support[s] a conclusion that the government's interests outweigh [Plaintiffs]."  *Green*, 73 F.4th at 1268; *see Duke*, 997 F. Supp. 2d at 1302 (holding that a police department's interest in efficiently performing its duties outweighed plaintiff's free speech rights where plaintiff's speech caused "internal disruption," negatively impacted the department's reputation, offended the wider community, raised concerns that the police department may be prejudiced, and "undermine[d] confidence" in the police department"); *see also Hussey v. City of Cambridge*, No. 21-CV-11868-AK, 2022 WL 6820717, at *5 (D. Mass. Oct. 11, 2022) (observing in the context of a First Amendment retaliation case that "George Floyd's murder is inextricably tied to discussions about police brutality and racial justice, and it is a topic that may be deemed controversial, divisive, and prejudicial").  The Court therefore determines that the School District's interests in quelling the

turmoil that had arisen in the School District in light of Mr. Oakes's speech outweighed Mr. Oakes's First Amendment interest in making that speech because said turmoil was interfering with the School District's overall operations.

## C. Pedagogical interests and reputational concerns

Finally, even if the disruptions to school operations and reputational damage caused to the School District did not clearly outweigh Mr. Oakes's free speech interests, the School District has also introduced ample evidence that Mr. Oakes's speech undermined the School District's educational mission. One of the many considerations that the Supreme Court has expressly encouraged courts to take into account when conducting *Pickering* balancing is the extent to which the employee's speech disrupts the mission of the institution. *See Rankin*, 483 U.S. at 388.

In June 2020, the School District's Governance Team, including all School Board members, issued a statement addressing the death of George Floyd, racism, police brutality, among other things. The statement, which represents the School District's goal of inclusivity, is set forth in its entirety as follows:

A message from the School District of Lee County Governance Team:

The actions that led to the death of George Floyd and the protests that followed have left us overwhelmed with grief and sadness. We are writing to you today with a heavy heart. We acknowledge the pain that many in our community are experiencing and we want you to know that the School District of Lee County stands with you against police brutality and racism. Please know that you are not alone and that in these turbulent times we are stronger together.

The district's goal of becoming a world-class school system can only be achieved if all students and staff feel safe and valued. We recognize the power that our education system has in shaping discourses on topics such as race and race relations. That is why it is our goal to work with

community leaders to further the dialogue on how we as a district can best address these important issues.

As a community, we must model the compassion and humanity everyone deserves. We are committed to the principles of equity and restorative practices so that we can ensure that all students reach his/her highest personal potential. Our strength is our diversity, and we recognize the trials of our past so that we can work together for a more just future.

As leaders of the School District of Lee County, we affirm our resolute Commitment to our values of diversity and inclusiveness and condemn racism in all its forms.

We know that many in our community are hurting and that there is no easy solution. But there is an obligation that we have to our children and the future of our community. Let's do this together. One conversation, and one action, at a time.

(Doc. 143-1 at 199–200). As Superintendent Adkins testified, "[w]e want all students to feel valued, like they're going to get a high-quality education in our organization. And that's what [the statement] reflects." (Doc. 143-1 at 67). Ms. Giovanelli testified that the statement reflected that "as a district we are against any racism in general, and that we will strive to make sure that doesn't happen in our district" and that "[w]e have a lot of diversity in our district and everyone is different throughout." (Doc. 138-7 at 153–54).

The School District's statement, which reflected the mission of the School to provide an inclusive learning environment to a large and diverse student population, was challenged by Mr. Oakes's speech. Mr. Oakes described George Floyd as "a disgraceful career criminal , thief , drug addict , drug dealer and ex-con who served 5 [years] in prison for armed robbery on a pregnant woman , and spent his last days passing around fake 20's to store owners in Minnesota." (Doc. 138-7 at

336).  The post also stated that the police officer involved in the actions that caused George Floyd's death was "a 20 year public servant, who was unlucky enough to be the one having to deal with this drug addicted criminal, a true disgrace to our human race that represents all that is wrong with our society."  (*Id.*)  "[Mr. Oakes's] intent may not have been to convey an offensive message, but his chosen manner of speech left ample room for interpretation."  *Duke*, 997 F. Supp. 2d at 1302.  Here, the record demonstrates that Mr. Oakes's comments elicited unfavorable associations between the School District and Mr. Oakes's views.

As one teacher in the School District stated in an email to the School Board, "[t]hese racist, anti-black opinions directly oppose our district's mission of providing inclusive education for students of all abilities, needs, and backgrounds."  (Doc. 138-7 at 309).  A newspaper article quoted Ms. Jordan as stating, "[w]hen we say that we're going to be committed to our values of diversity and inclusion and condemn racism in all forms, we have to stand by that.  We cannot have one statement that says one thing and allow another to stand."  (Doc. 138-32 at 3).

In response, some school board members expressed the sense that their actions responding to Mr. Oakes's Facebook post were an opportunity to condemn what they perceived to be a racist message that was contrary to the School District's own values.  For example, Ms. Gittens, told a local newspaper, "We have a lot of young people looking at us and watching what it is we do and how we handle situations."  (Doc. 143-5 at 240–41).

In sum, a review of the record evidence demonstrates that no genuine issue of

37

material fact exists as to the disconnect between the School District's June 5, 2020 message and the contents of Mr. Oakes's June 6, 2020 Facebook post, which raised doubts in the community about the School District's ability to carry out its stated goals.  The evidence is therefore clear that irrespective of criticism as to how tenuous the connection between the School District and Mr. Oakes may have been, the School District was associated with what many in the southwest Florida community perceived as controversial and divisive views about the circumstances surrounding the death of George Floyd.  Further, as indicated above, many involved in the administration of the School District believed that Mr. Oakes's statements undermined the "district's goal of becoming a world-class school system," where "all students and staff feel safe and valued."  (Doc. 143-1 at 199).  These factors weigh in favor of the School District in the *Pickering* balance.  *See Duke*, 997 F. Supp. 2d at 1303 ("[T]he politically charged context also heightens the potential for Plaintiff's particular speech to damage the [District]'s interests.").

After carefully weighing these factors, the Court finds that the School District's stated interests outweigh Plaintiff's First Amendment interests.  Mr. Oakes's Facebook post caused the School District to be concerned that the health of its students was not being appropriately minded; it disrupted the School District's operations as a result of numerous public complaints, numerous requests for comments related to Mr. Oakes's post from reporters, and a security concern for one of its school board members; and it undermined the school's mission by contradicting the school's efforts to promote an inclusive environment cognizant of

the fact that many in the Lee County School District community might be upset by the death of George Floyd.  Accordingly, the Court finds that the balance of interests from the second step of the *Pickering* test weigh in favor of the School District.

Because the *Pickering* balancing test weighs in favor of the School District, Plaintiffs' First Amendment retaliation claims fail as a matter of law.

## II.      Qualified Immunity

Having granted summary judgment to the School District on Plaintiffs' First Amendment retaliation claim, the Court now turns to the claims against the individual defendants.  Defendant staff members and school board members argue that they are entitled to qualified immunity, and because they are entitled to qualified immunity, the Court must enter summary judgment in their favor for Plaintiffs' claim of First Amendment violations pursuant to Section 1983.  (Doc. 140, Doc. 143).  Plaintiffs respond that Defendants are not entitled to qualified immunity because they were on notice that their conduct constituted a violation of Plaintiffs' constitutionally protected free speech rights.  (Doc. 152; Doc. 153.)  For the reasons discussed below, the Court finds that all of the individual defendants are entitled to qualified immunity.

"A government official who is sued under §1983 may seek summary judgment on the ground that he is entitled to qualified immunity." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004).  Qualified immunity offers complete protection for individual public officials performing discretionary functions "insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation omitted). Accordingly, whether an official "may be held personally responsible for an allegedly unlawful action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). "If a constitutional right would have been violated under the plaintiff's version of the facts, the next, sequential step is to ask whether the right was clearly established." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).[6]

The Eleventh Circuit has explained that "[t]he law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007).

---

[6] The Supreme Court has clarified that "courts may exercise their sound discretion in deciding which of the two prongs should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

However, "[b]ecause no bright-line standard exists to put the employer on notice of a constitutional violation, this circuit has recognized that a public employer is entitled to immunity from suit unless the *Pickering* balance 'would lead to the inevitable conclusion that the discharge of the employee was unlawful.'" *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991) (quotation omitted). That is, using the *Pickering* balancing test that the Court applied in the preceding section, do Plaintiffs' First Amendment interests outweigh the School District's interests such that the imbalance would lead to the inevitable conclusion that terminating the Oakes Farms contract was unlawful? Would the result of such a balancing test "be so evidently in favor of protecting the employee's right to speak that reasonable officials in appellees' place would necessarily know that the termination of [the Oakes Farms' contract] under these circumstances violated [Plaintiffs'] constitutional rights[?]" *Id.*; *see also Camp v. Corr. Med. Servs., Inc.*, 400 F. App'x 519, 520–21 (11th Cir. 2010) ("[I]t is not enough to defeat a qualified immunity defense that under the facts of the case the *Pickering* balance tilts in favor of the plaintiff's free speech. Instead, the balance must tilt decidedly in favor of the plaintiff's speech in order for the defendants to have fair and clear notice that they were violating the plaintiff's constitutional rights.").

Here, before strictly applying the same *Pickering* balancing test as above, the Court notes that the individual Defendants' interests in effectively managing the district are identical to the School District's interests. First, Superintendent Adkins is charged with "the administration and management of the schools and for the

supervision of instruction in the district." Fla. Stat. § 1001.32(2)-(3). "The district school superintendent is the secretary and executive officer of the district school board, and as such, is responsible for the administration and management of schools and for the supervision of instruction in the school district." *McCalister v. Sch. Bd. of Bay Cnty.*, 971 So.2d 1020, 1024 (Fla. 1st DCA 2008). As Superintendent Adkins testified, "the District['s] views" were his views because he "represent[s] the district" and was the chief of staff of all of the district. (Doc. 138-1 at 150–51.) Thus, the interests of the School District can safely be attributed to Superintendent Adkins given Superintendent Adkins' role as representative and manager of the School District.

The same is true of Mr. Ross, who was in charge of procurement for the School District. Mr. Ross's role, per Florida statute, entailed "broad authority for management policies and general school district operations related to the noninstructional program" and "report[ing] directly to the school superintendent and supervise other administrative employees." Fla. Stat. § 1012.01(3)(b). Accordingly, when Mr. Ross investigated Oakes Farm's COVID-19 protocols, advised Ms. Desamours and Superintendent Adkins of his findings, and recommended the termination of the contract, he was acting in furtherance of the School District's interests, and in service of Superintendent Adkins. Thus, the Court finds that the interests of the School District can be safely imputed to Mr. Ross. The same is true of the School Board members who are charged, when acting as a board, not individually, with "exercis[ing] all powers and perform[ing] various

duties in the establishment and the operation of the schools." *See Fla. Family Ass'n v. Sch. Bd.*, 494 F. Supp. 2d 1311, 1323 (M.D. Fla. May 11, 2007) (quoting Fla. Stat. § 1001.42).

As indicated above, based on the undisputed record evidence, the *Pickering* balancing test yields the conclusion that the LCSD's interests outweigh Plaintiffs' First Amendment interests. Thus, the Court finds that because the *Pickering* balance tilts in favor of the School District's interests, Superintendent Adkins did not have fair and clear notice that he was violating Plaintiffs' constitutional rights. That is, based on the record evidence, the Court declines to hold that Superintendent Adkins would inevitably have been led to conclude that his actions violated Plaintiffs' constitutional right to free speech. *See Busby*, 931 F.2d at 774. Accordingly, Superintendent Adkins, Mr. Ross, and the School Board members are also entitled to qualified immunity.

Moreover, "[b]ecause *Pickering* requires a balancing of competing interests on a case-by-case basis, *only in the rarest of cases* will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights." *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 2017). "[T]he employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the [act taken against] the employee was unlawful." *Id.* (alteration in original). This situation is far from one that leads this Court to the "inevitable conclusion" that any unlawful activity occurred given that, as the Court has determined above, the

*Pickering* balancing test weighs in favor of the School District.  Accordingly, for these multiple reasons, the Court finds that the individual Defendants have qualified immunity, Defendants' Motion for Summary Judgment (Doc. 143) is due to be granted as to Count I of Plaintiffs' Complaint, and Ms. Patricca's Motion for Summary Judgment (Doc. 140) is due to be granted in full.

### III.   Legislative Immunity

The individual defendants also assert that they are entitled to legislative immunity.  Because the Court has already found them entitled to qualified immunity, however, the Court will not engage in a legislative immunity analysis as doing so would be redundant.

### IV.   Remaining State Law Claims

Having carefully reviewed the operative complaint and summary judgment record, it is clear to this Court that the remaining Florida constitutional, statutory, and common law claims should be addressed by a Florida state court.  As the Supreme Court has explained, "[c]ertainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."  *United Mine Workers of America v. Gibbs*, 86 S. Ct. 1130, 1139 (1966); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court.  We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").  This principle of supplemental jurisdiction was codified in 28 U.S.C. § 1367(c), which

provides that district courts have discretion not to exercise supplemental jurisdiction over a claim in four situations:

> (1) the claim raises a novel or complex issue of state law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*See* 28 U.S.C. § 1367(c). "Any one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's supplemental state law claims." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006).

Here, the third factor in section 1367(c) applies. The Court has original jurisdiction over Plaintiffs' First Amendment retaliation claims and Section 1983 claims against the individual Defendants. The Court has granted summary judgment in favor of Defendants as to these claims and determined that each of the individual Defendants are entitled to qualified immunity. Because the federal claims were dismissed, the Court, in its discretion, chooses to not exercise supplemental jurisdiction over Plaintiffs' Florida state law claims. *See Hicks v. Moore*, 422 F.3d 1246, 1255 n.8 (11th Cir. 2005) ("Today's decision [granting summary judgment in favor of Defendants], in effect, eliminates all federal claims in this case, leaving only Plaintiff's state-law claims. We allow the district court to exercise its discretion, under the *Gibbs* doctrine, to decide whether or not to consider Plaintiff's state-law claims on remand"); *Murphy v. Florida Keys Elec. Co-op. Ass'n, Inc.*, 329 F.3d 1311, 1320 (11th Cir. 2003) ("Once the district court

granted summary judgment on [Defendant's] contribution claim it had the discretion to dismiss" a third-party's state-law based counterclaim").

The Court thus dismisses those claims (Count II, Count III, Count IV, Count V, and Count VI) without prejudice.  The Court is, however, hopeful, that the parties can resolve this matter without further judicial intervention.

## CONCLUSION

For the reasons outlined above, the Court grants summary judgment in favor of Defendants with respect to Count I, Plaintiffs' First Amendment Retaliation Claim.  Further, all of the individual Defendants are entitled to qualified immunity and are due to be dismissed from this case with prejudice.  Finally, all of Plaintiffs' state law claims are dismissed without prejudice.

For the foregoing reasons, the Court finds that:

1. Plaintiffs Alfie Oakes and Oakes Farms Distributions' Motion for Summary Judgment (Doc. 141) is **DENIED**.

2. Defendants' Motion for Summary Judgment (Doc. 143) is **GRANTED** in part.

3. Defendant Chris Patricca's Motion for Summary Judgment (Doc. 140) is **GRANTED** to the extent that Ms. Patricca (named in Counts One and Two) is entitled to qualified immunity.  Thus, Ms. Patricca is **DISMISSED** from this case with prejudice.

4. Because the Court dismisses all Florida state claims without prejudice to any right to refile such claims in Florida state court, Plaintiffs' and

Defendants' motions for summary judgment as to all Florida state law claims: (Count II (violation of Fla. Const. Art. I, § 4), Count III (breach of contract), Count IV and V[7] (Florida's Government-in-the-Sunshine Law), Count V are **DENIED AS MOOT**.

5. Defendants Gregory Adkins, Frederick Ross, Mary Fischer, Debbie Fischer, Melissa Giovanelli, Gwynetta Gittens, and Cathleen Morgan (named in Counts One and Two) are entitled to qualified immunity and are therefore **DISMISSED** from this case with prejudice.

6. Given the Court's order, scheduling of oral argument, per Plaintiffs' request (Docs. 142, 161), is **DENIED AS MOOT**.

7. The Clerk is directed to terminate all pending motions and deadlines, to close the file, and to enter judgment accordingly.

**ORDERED** in Fort Myers, Florida on October 16, 2023.

_____

JOHN L. BADALAMENTI

UNITED STATES DISTRICT JUDGE

---

[7] As previously noted, Plaintiffs mistakenly allege two Count Vs, both purported violations of Florida's Government-in-the-Sunshine Laws.  It is the Court's intent that both Count Vs be denied as moot such that Plaintiffs may, should they so choose, file such claims in Florida state court.